STATE OF NEBRASKA V. UNION PACIFIC RAILROAD COMPANY.

FILED MAY 23, 1910.  No. 15,988.

1. **Statutes:** CONSTRUCTION. The acts of the legislature popularly known as the "Railway Commission Act" (laws 1907, ch. 90), the "Anti-Pass Act" (laws 1907, ch. 93), and the "Two-Cent Fare Act" (laws 1907, ch. 92), follow the mandate to the legislature contained in section 7, art. XI of the constitution, are *in pari materia*, and must be construed together.

2. **Carriers:** RATES: UNIFORMITY. Under the law in this state, a railroad company or other common carrier may not exchange transportation for services or property by way of barter, uniformity of charge being required.

3. ———: ———: ———. To procure uniformity there must be a standard measurement. The only standard measure possible in order to insure absolute uniformity in the charge is money.

4. ———: ———: ———. A contract which provides for transportation to be issued in exchange for newspaper advertising or for

services the value of which is indeterminate, and which permits the amount to be paid for such service to be fixed by agreement of the parties, leaves the rate charged for the transportation a variable quantity.

5. ———: ———: ———. A contract by a railroad company to furnish to the proprietors of a newspaper, as requested, transportation at the statutory rate (under certain limitations and restrictions not required in ordinary tickets) in payment for advertising to be furnished "at agreed rates," which agreed rates are not specified in the contract, but which are to be settled by the parties themselves by another agreement, is in violation of section 14 of the "Railway Commission Act" (laws 1907, ch. 90, Ann. St. 1909, sec. 10662), which prohibits common carriers from charging one person a greater or less compensation than another, and which prohibits charging "other than the rates fixed and established."

6. ———: ———: ———. If the proprietor of one newspaper may be selected by the defendant to receive transportation in return for such services, while the proprietor of another cannot avail himself, at his own option, of the privileges of such a contract, then equality and uniformity of charge do not exist.

7. ———: ———: ———. Such a contract contravenes the intent and purpose of the statutes which prohibit unjust discriminations, and which seek to preserve to every individual an equal right to the transportation service of every common carrier within the state upon equal terms with every other individual.

ORIGINAL action by the state to enjoin defendant from carrying out certain contracts. *Injunction allowed.*

*William T. Thompson, Attorney General,* for plaintiff.

*Nelson H. Loomis, Edson Rich* and *E. H. Crocker,* contra.

LETTON, J.

This is an original action in this court brought by the attorney general in the name of the state and by the authority of the Nebraska State Railway Commission to enjoin the defendant railroad company and its officers, agents, and servants from carrying out certain contracts made with the owners of certain newspapers in the state

of Nebraska providing for the issuance of railroad tickets and the furnishing of transportation to certain classes of persons named in the contract, for advertising to be furnished the railroad company in the newspapers belonging to the other contracting parties. A temporary restraining order was prayed for and granted at the time of the filing of the petition. It is shown by the evidence that the command of the restraining order was obeyed and that since its issuance no other contracts of the kind have been entered into, the contracts in existence have been abrogated, and the transportation issued recalled. The defendant railroad company, however, still insists that the execution of such contracts and the furnishing of transportation in accordance therewith is not a violation of law, and, while obeying the restraining order, insists upon its right to have this question determined.

Before considering the legal proposition involved, it will be necessary to summarily state the evidence. A copy of a contract entered into with the owner of the "New Era" of Kearney is set forth in the petition, and it is conceded that contracts entered into with a number of other publishers in the state are substantially the same. The contract referred to is as follows:

"Whereas, W. L. Hand, of Kearney, Nebr., is the President of the New Era Standard, a daily, semi-weekly, weekly, monthly newspaper, published at Kearney, in the county of Buffalo, and state of Nebraska, a general weekly newspaper, established 1880, having a circulation of 1,000 copies per issue, desires to enter into a contract with the Union Pacific Railroad Co. for advertising in said newspaper as hereinafter provided: Now, therefore, this agreement made and entered into upon the second day of January, 1908, by and between the said W. L. Hand, as party of the first part, and said Union Pacific Railroad Co., as party of the second part, witnesseth: That the party of the first part agrees to publish in the issue of said paper, at agreed rates, from January second, 1908, to Dec. 31, 1908, as follows:

"1st.—Such display advertisements, or lines of local notices in the regular local news columns of said paper from time to time during the life of this contract, as shall be furnished in manuscript or printed copy by the party of the second part.

"2d.—It is agreed that in full payment for the said advertising, the said second party shall pay, and the first party shall accept nontransferable advertising transportation over the lines of Union Pacific Railroad Co. in the state of Nebraska only, to the value of one hundred ($100.00), the transportation not to be limited beyond the time the contract expires, and not extended under any circumstances. The Union Pacific Railroad Co. reserves to itself the right to limit such transportation to any train or class of trains, and to refuse to honor said transportation upon any special, limited or fast mail train.

"3d.—It is understood that no ticket issued under this contract shall under any circumstances be used by the holder for any part of an interstate journey, and if presented for passage in connection with an interstate journey, shall be void and conductor will lift ticket or tickets and collect full fare.

"4th.—It is also further agreed that the transportation above referred to must be requested and used during the calendar year, and that no claim for failure so to do will be considered. The transportation referred to above is to be granted for W. L. Hand, who occupies the position of Editor and Manager, family of W. L. Hand, John A. Rhone, who occupies the position of Secretary and Foreman, and family of A. Rhone on the newspaper above mentioned, or in the name of the Wife, Son or Daughter of the Proprietor, Business Manager or Editor of the paper above mentioned.

"5th.—It is understood and agreed that, should said transportation be sold, loaned or traded off, or presented for passage by any person other than the one whose name is written thereon, it shall then be taken up by the conductor and not again made good by the party of the sec-

ond part to the said first party. The misuse of transportation may be considered as sufficient cause for the cancelation of this contract.

"6th.—It is also understood and agreed that no additional transportation is to be granted on account of said advertisement, and that the conditions specified on each ticket are hereby made a part of this contract.

"7th.—The party of the second part will not pay for the publication of its time tables unless such publication be specially authorized in writing by the General Passenger Agent of Union Pacific Railroad Co.

"8th.—The party of the second part reserves the right to revoke this contract at will, discontinue the advertisement, and call in the transportation issued.

"9th.—If the ownership of said publication be transferred, it is agreed that the assumption of this contract is to be made a part of the consideration for said transfer. Otherwise this contract shall thereby be canceled and all transportation thereunder shall thereby become void.

"10th.—Should the person or persons to whom transportation is issued on account of this contract sever his or her connection with said paper from any cause whatever, then the transportation held by such person or persons shall be surrendered to the party of the second part at once and no transportation issued for any other person or persons on account of said paper until after the said transportation has been returned. It is also agreed that a copy of each issue of said paper shall be mailed free to agent of said Co. at Kearney, Nebr., and Chas. Ware, Superintendent at Omaha, Nebr., and also one to E. L. Lomax, General Passenger Agent, at Omaha, Nebr. All requests for transportation must be made through the agent above.

"11th.—This contract expires Dec. 31, 1908.

"In witness whereof, the said first party has hereunto set his hand and seal, and the said party of the second part has caused this contract to be executed by its General Passenger Agent upon the second day of January, 1908.

(Signed) New Era Pub. Co, by W. L. Hand, Pres. Union Pacific Railroad Co. By (Signed) E. L. Lomax, General Passenger Agent. Darlow."

The testimony of the employee in charge of the advertising department of the defendant in regard to the customary dealings with newspaper owners under the contract is to the effect that the advertisements placed in all such newspapers are to be charged at the regular rate charged by the newspaper in each case to the public generally for the same service, which would vary in different localities; that a statement or bill would be rendered by the publisher for the advertising done, and that the transportation issued did not exceed the value of the advertising when the transportation was measured at the rate of two cents per mile; that it was not issued when the advertising was placed, but after the advertising had been run, and the statement of the amount due followed; that the transportation issued did not exceed the amount of the bills rendered, and that special forms of trip, 500-mile, and 1,000-mile tickets were issued under these contracts. It is also shown that the railroad company had no permission or authority from the railway commission to enter into the contracts, either before or after their execution.

The attorney general contends that the contracts and the tickets issued in conformity therewith constitute a violation of the acts popularly known as the "Railway Commission Act" (laws 1907, ch. 90, Ann. St. 1909, secs. 10649-10663), the "Anti-Pass Act" (laws 1907, ch. 93, Ann. St. 1909, secs. 10664, 10665), and the "Two-Cent Fare Act" (laws 1907, ch. 92, Ann. St. 1909, secs. 10618, 10619), and that the transportation issued under the contract constituted a special rate, an unjust discrimination, and an unreasonable preference, as defined by said acts. He takes the broad ground that transportation furnished by a railroad company for any consideration other than a money consideration, to an adult, and at a rate other than two cents per mile, constitutes an unjust discrimination prohibited by law.

The defendant contends that, under the contract, the railroad company paid for the advertising furnished at the regular published and current rates by credits upon its books for the amount furnished, and that the transportation was paid for at the full legal rate of two cents per mile by such credits; that the Nebraska law is designedly different from the interstate commerce acts, in that it does not prohibit "different" compensation for transportation, and does not limit payment to cash only; that if the act had regulated the medium of payment it would have been unconstitutional; that there was no attempt to discriminate, or to violate the two-cent fare law, and that what was done had no such effect.

The sections of the statutes (Ann. St., 1909) controlling the case are as follows:

Section 10618.  "It shall be unlawful for any railroad corporation operating, or which shall hereafter operate, a railroad in this state to charge, collect, demand, or receive for the transportation of any passenger over twelve years of age, with baggage, not exceeding two hundred pounds in weight, on any train over its line of road in the state of Nebraska, a sum exceeding two cents per mile, provided, that no railroad company shall be required to sell any ticket for less than five cents."

Section 10662, so far as applicable, is as follows: "If any railway company or common carrier subject to the provisions of this act, directly or indirectly, through or by its agents, officers or employees, by any special rate, rebate, drawback, or other device, shall charge, demand, collect or receive from any person, firm or corporation, a greater or less compensation for any service rendered, or to be rendered by it than it charges, demands, collects, or receives from any other person, firm, or corporation for doing a like and contemporaneous service, the same shall constitute an unjust discrimination, which is hereby forbidden and declared to be unlawful.  (a) If any railway company or common carrier subject to the provisions of this act, through or by its officers, agents, or employees,

makes or gives any undue or unreasonable preference or advantage to any particular person, company, firm, corporation or locality, * * * the same shall constitute an unjust discrimination, which is hereby prohibited. * * * (f) Any officer, agent or employee of any railway company or common carrier subject to the provisions of this act, who, by means of false billing, false classification, false weight, or by any other device, shall suffer or permit any person or persons to obtain transportation for property at less than the regular rates then in force on said line of said railway company or common carrier, or any part thereof, or who, by means of false billing, false classification, false weighing, or by any device whatsoever, shall charge any person, firm or corporation for the transportation of property other than the rates fixed and established, upon the line of said railway company or common carrier, shall be guilty of a misdemeanor."

Section 10664, prohibiting free transportation, should also be considered as bearing upon legislative policy in this regard. These provisions of the statutes, though forming parts of separate acts, enacted at different times, treat of the same subject matter. They form stages in the progressive development of legislation seeking to correct abuses which formerly existed. They carry out specifically the mandate to the legislature given by section 7, art. XI of the constitution, that "The legislature shall pass laws to correct abuses and prevent unjust discrimination and extortion in all charges of express, telegraph and railroad companies in this state and enforce such laws by adequate penalties to the extent, if necessary for that purpose, of forfeiture of their property and franchises." They are, therefore, *in pari materia* and must be construed together. *State v. Omaha Elevator Co.*, 75 Neb. 637; *State v. Martyn*, 82 Neb. 225.

The statute provides that the carrier shall not collect or receive "a greater or less compensation" from one person than from another. The railway commission act commanded all railway companies in Nebraska to file with

the railway commission scheduled rates and charges in effect on their lines in the state of Nebraska on January 1, 1907, which rates should be the rates and charges in force and effect unless changed by the railway commission in conformity with procedure provided for in the act. The rate of charge for passenger transportation was also fixed by statute. These rates and charges are expressed and measured by dollars and cents. If a railway company can adopt the principle of barter and receive in return for its service specific articles the value of which may vary from day to day, and often may be uncertain, the magnitude of the task of ascertainment of the value of each article alone would render the regulation of rates, so as to prevent discrimination, absolutely impossible. To procure uniformity there must be a standard measurement. The only measure possible in order to insure absolute uniformity in the charge is the standard medium of exchange and measure of value—money.

But, it is contended, although the rate charged for advertising varies in different localities, yet the amount charged in each instance is the regular current rate charged to the public generally in that locality, and that, since the railway company would be required to pay this rate in money for the advertising furnished, it is not discrimination to pay for it in transportation at the statutory rate.

This argument loses sight of two considerations: First, that no price or rate of charges for the advertising is fixed in the contract. The publication is to be "at agreed rates," leaving the parties free to fix for themselves by agreement the value of the service rendered and the price to be paid. It is true that the witness testifies that the agreement has always been the same as the current rate for advertising in the locality, but there is nothing in the contract which requires the price agreed upon to be the current rate to the public generally. A contract which permits transportation to be issued in exchange for a product or for services, the value of which is indeterminate, and which

leaves the charge to be fixed by agreement of the parties, plainly leaves the price of the transportation a variable quantity. The price of the ticket would vary exactly as the price of the advertising varied. If the parties agree upon a high rate of advertising, they agree to a low rate for transportation, and *vice versa*. It could never have been the intention of the legislature to permit such an opportunity to evade the terms of the law. Giving the defendant credit for acting in good faith, as its witness testifies, in making the contracts complained of, and in making agreements thereafter to pay for advertising at current prices, still to uphold such contracts would open a door which in the hands of designing persons might operate to nullify the most essential and beneficial provisions of this legislation. *Union P. R. Co. v. Goodridge,* 149 U. S. 680; *United States v. Atchison, T. & S. F. R. Co.,* 163 Fed. 111.

Furthermore, there is no proof that any persons or corporations, other than the favored persons with whom the railroad company is willing to enter into such contracts, may avail themselves of the privilege of paying for transportation for themselves or for their employees or members of their respective families by the use of their advertising pages. If the proprietor of one newspaper may be selected by the defendant to receive transportation in return for such services, while the proprietor of another cannot avail himself, at his own option, of the privileges of such a contract, then certainly equality and uniformity of charge, which is required by both common law and statute, do not exist (*McDuffee v. Portland & R. R. Co.,* 52 N. H. 430; *Sandford v. Catawissa, W. & E. R. Co.,* 24 Pa. St. 378), while if money were the only consideration and the same rate were charged, each would stand exactly upon the same footing.

The defendant insists that the only advantage that it derives from these contracts is that it thereby sells transportation to persons who otherwise might not purchase it; but, if persons belonging to a certain class are induced

to purchase transportation in excess of that which they would buy for cash, it is plain that the inducement must be sufficiently strong to cause them to believe that they are receiving transportation for a less amount than if they paid for it in money, or that they are receiving advertising patronage not otherwise to be had. There evidently must be some advantage accruing to the contracting parties, or each of them must think so, else they would not enter into the contract.

If the newspaper owner is of the opinion that, under the contract, in return for advertising at current prices to the public generally, he is receiving transportation upon the same basis and under no other or greater limitations than the public generally, he is in error. In addition to the limitations expressed in the contract itself that the transportation shall not be limited beyond the time the contract expires, and not extended under any circumstances; that it cannot be used for any part of an interstate journey, and if presented for passage in connection with an interstate journey shall be void; that if the ownership of the publication is transferred, unless the contract is assumed, all transportation thereunder shall thereby become void, it is provided in the 500 and 1,000-mile ticket issued thereunder that in case the holder severs his connection with the publication on account of which the ticket is issued, or in case the advertising contract under which it is issued shall be canceled, all further rights under the contract to the use or possession of the ticket are surrendered, and the same may be taken up wherever found.

A somewhat similar contract, made with reference to Munsey's Magazine, was under consideration in the case of *United States v. Chicago, I. & L. R. Co.*, 163 Fed. 114, although the contract in that case was less objectionable than that under consideration, being specific with regard to the cost of the advertising. It specified the amount of advertising space to be furnished in exchange for tickets to the value of $500, while this contract leaves the whole

matter of price open to future agreement. The court say : "Indeed, if it is taken at its cash value, why should the transportation be limited as specified in the contract? If the magazine is paying $500 to the defendant, why does it accept transportation both of less and different value than it would accept if it bought its tickets with money? Why embarrass itself with menacing pains and penalties for failure to. observe all the conditions of the special contract, when by the use of cash it may travel and give no concern to technical limitations? It seems fair to conclude that either the advertising is of less than cash value, or the advertisers are grossly imposed upon by the railroad." The court further point out that in that contract, as in this, there is no provision requiring that the advertising must have been furnished before the transportation is given, and shows that the publisher could under the contract demand the tickets at once if he chose and at the beginning of the term, and therefore in the mere matter of interest the rate would be less and different from that which is published.

The principal point urged in the oral argument by counsel for defendant was that, since the statute does not prohibit receiving a "different" compensation, the contract is not in violation of the statute. Counsel urges that the case of *United States v. Chicago, I. & L. R. Co., supra,* is based upon the peculiar language of the Hepburn act (34 U. S. St. at Large, pt. 1, ch. 3591, p. 584), whereby the word "different" was added to the words "greater or less compensation" in the Elkins act, but we do not so understand the decision in this case. While the writer of the opinion discusses the change in the statute, and holds the facts bring the case within the terms of the Hepburn act, he does not say that the contract does not violate the Elkins act. But, regardless of what the decisions of the federal courts have been upon the Elkins act, under the provisions of section 10662 of the Nebraska statute, it is an infraction of law "by any device whatsoever" to "charge any person, firm or corporation for the transportation of

property *other* than the rates fixed and established." The difference between the meaning of a statute which prohibits a "different" compensation and one which prohibits a charge *"other* than the fixed and established rates" is to the writer imperceptible, and the reasoning applicable to one statute seems to apply with equal force to the provisions of the other. Moreover, in *Armour Packing Co. v. United States,* 209 U. S. 56, 72, the Elkins act (32 U. S. St. at Large, pt. 1, ch. 708, p. 847) is construed, and it is said: "The Elkins act proceeded upon broad lines and was evidently intended to effectuate the purpose of congress to require that all shippers should be treated alike, and that the only rate charged to any shipper for the same service under the same conditions should be the one established, published and posted as required by law." We think the purpose of the acts identical, and construe the Nebraska statute to have the same intent, and to make the same requirements in this behalf.

To sum up, when it is considered that, although the transportation is said to be sold at the rate of two cents per mile, it is, in fact, hedged about by many restrictions and limitations not contained in the tickets offered for sale to the general public for the same price in cash; considering, also, that the privileges, if any, and whatever they may be, under the contract, are not open upon the same terms to all persons engaged in the publication of newspapers within the state; considering, also, the fact that the amount to be paid for the advertising, and therefore necessarily the amount to be paid for transportation under the terms of the contract, may be fixed at whatever rate the parties subsequently agree upon, it seems obvious that the contract runs counter to the intent and purpose of the constitution and statutes quoted. These seek to prohibit unjust discriminations, either direct or indirect; they are designed to take away from a public carrier the power of arbitrary selection of persons or corporations as the objects of its favor or disfavor; they seek to preserve to every individual an equal right to the trans-

portation service of every common carrier within the state upon equal terms with every other individual. As was said of the interstate commerce act (32 U. S. St. at Large, pt. 1, ch. 708, p. 847) of 1903 by Mr. Justice White, in *New York, N. H. & H. R. Co. v. Interstate Commerce Commission*, 200 U. S. 361, 391: "It cannot be challenged that the great purpose of the act to regulate commerce, whilst seeking to prevent unjust and unreasonable rates, was to secure equality of rates as to all and to destroy favoritism; these last being accomplished by requiring the publication of tariffs and by prohibiting secret departures from such tariffs, and forbidding rebates, preferences and all other forms of undue discrimination. To this extent and for these purposes the statute was remedial and is, therefore, entitled to receive that interpretation which reasonably accomplishes the great public purpose which it was enacted to subserve."

We are convinced that (to adopt the language of Mr. Justice Day in *American Express Co. v. United States*, 212 U. S. 522, 532, decided February 23, 1909): "In the absence of express exceptions, we think it was the intention of congress (the legislature) to prevent a departure from the published rates and schedules in any manner whatsoever. If this be not so, a wide door is opened to favoritism in the carriage of property." The fundamental principles covering the duties of common carriers to the public in respect to equal privileges have been clearly elucidated in the following cases, and are so well settled as to make quotation needless, but the opinions are worthy of careful consideration: *Messenger v. Pennsylvania R. Co.*, 36 N. J. Law, 407; *M'Neill v. Durham & C. R. Co.*, 132 N. Car. 510; *New York, N. H. & H. R. Co. v. Interstate Commerce Commission, supra; United States v. Wells-Fargo Express Co.*, 161 Fed. 606.

Even though, as it pleads, the defendant may have entered into these contracts with no intention of violating the law, and has obeyed the restraining order of the court, yet the practice was pernicious and was an unlawful discrimination under the statute.

The prayer of the petition for a permanent injunction against defendants must be allowed.

                                INJUNCTION ALLOWED.

Rose, J., not sitting.