STATE, EX REL. MISSOURI PACIFIC RAILWAY COMPANY, RELATOR, v. HENRY T. CLARKE, JR., ET AL., RESPONDENTS.

FILED JUNE 19, 1915. No. 18975.

1. Carriers: RATES: POWER OF STATE RAILWAY COMMISSION. The constitutional amendment creating the state railway commission did not grant to that body exclusive power to fix rates for the transportation of freight and passengers. Const., art. V, sec. 19a.

2. ———: ———: ———. Under the constitutional amendment creating the state railway commission, it may fix rates only in the absence of specific legislation. Const., art. V, sec. 19a.

3. Statutes *in pari materia* must be construed together.

4. Carriers: PASSENGER RATES: POWER OF STATE RAILWAY COMMISSION. The power conferred in general terms upon the state railway commission by the constitution and the state railway commission act does not authorize it to increase the maximum passenger rate of two cents a mile as fixed by the legislature in 1907. Const., art. V, sec. 19a; Rev. St. 1913, secs. 6067, 6107, 6109.

5. Statutes: CONSTRUCTION. A particular intention expressed in a legislative act, if in conflict with a general intention expressed in a later enactment, should be given effect, leaving the later act to operate only outside of the scope of the former.

ORIGINAL proceeding in mandamus to compel respondents to entertain relator's application for increase of passenger rates. *Writ denied.*

*E. J. White, B. P. Waggener* and *J. A. C. Kennedy,* for relator.

*Grant G. Martin, Attorney General,* and *W. T. Thompson, contra.*

*E. P. Holmes, amicus curiæ.*

ROSE, J.

This is an original application for a peremptory writ of mandamus directing the members of the state railway commission to pass on the merits of a petition by relator for an increase in existing railroad rates for the transportation of passengers. Respondents dismissed relator's petition. They resist the writ of mandamus because they are of the opinion that they have no power to increase passenger rates beyond the limits fixed by the following legislative enactment: "It shall be unlawful for any railroad corporation operating, or which shall hereafter operate, a railroad in this state to charge, collect, demand or receive for the transportation of any passenger over twelve years of age, with baggage not exceeding two hundred pounds in weight, on any train over its line of road in the state of Nebraska, a sum exceeding two cents per mile: Provided, no railroad company shall be required to sell any ticket for less than five cents." Rev. St. 1913, sec. 6067.

It is insisted that the constitutional amendment creating the state railway commission confers upon it power to change rates fixed by the legislature. The amendment declares: "The powers and duties of such commission shall include the regulation of rates, service and general control of common carriers as the legislature may provide by law. But, in the absence of specific legislation, the commission shall exercise the powers and perform the duties enumerated in this provision." Const., art. V, sec 19a.

Relator argues that the words, "as the legislature may provide by law," modify only the expression, "general control of common carriers," thus excluding "regulation of rates" from the modifying clause. That interpretation is

568          NEBRASKA REPORTS.          [VOL. 98

State, ex rel. Missouri P. R. Co., v. Clarke,

not warranted by the language construed. "As the legislature may provide by law" applies to the entire grant of power, including "regulation of rates." This is shown also by the concluding provision: "But, in the absence of specific legislation, the commission shall exercise the powers and perform the duties enumerated in this provision." The amendment did not grant to the state railway commission exclusive power to fix rates. Before the amendment was adopted the constitution declared: "And the legislature may from time to time pass laws establishing reasonable maximum rates of charges for the transportation of passengers and freight on the different railroads in this state." Const., art. XI, sec. 4. This provision is still a part of the supreme law. The fixing of rates, therefore, is still within the legislative power. It is in the absence of specific legislation that the state railway commission may exercise such authority. It follows that, since passenger rates were fixed by statute, authority of the state railway commission to increase them must be found in legislative action.

Relator further insists that power to increase passenger rates has been delegated to the state railway commission by the legislature. Following the adoption of the constitutional amendment at the general election in 1906, the legislature of 1907 passed an act defining the powers and the duties of the state railway commission. This became a law March 27, 1907, and to it relator points for authority to increase passenger rates. It contains the following provisions:

"The commission shall have the power to regulate the rates and services of, and to exercise a general control over all railroads, express companies, car companies, sleeping car companies, freight and freight line companies, and all other common carriers engaged in the transportation of freight or passengers within the state." Rev. St. 1913, sec. 6107.

"The commission shall have the power, and it shall be its duty to make all necessary classifications and to fix all necessary rates, charges and regulations to govern and

regulate the freight and passenger tariffs of railway companies and common carriers, the power to correct abuses and prevent unjust discriminations, extortions and overcharges in rates of freight and passenger tariffs on the different railroads in this state, and to enforce the same by having the penalties inflicted as hereinafter provided, through proper courts having jurisdiction." Rev. St. 1913, sec. 6109.

At the same session the legislature enacted another law known as the "Anti-pass Act." Separate acts reducing express charges and freight rates were also passed. The import of statutes relating to rates and to the powers and the duties of the state railway commission is determined from all the laws on the subject, including constitutional provisions. Referring to the "Railway Commission Act," the "Anti-pass Act" (Laws 1907, ch. 93), and the "Two-cent Fare Act" (Laws 1907, ch. 92), it was said in *State v. Union P. R. Co.*, 87 Neb. 29: "These provisions of the statutes, though forming parts of separate acts, enacted at different times, treat of the same subject matter. They form stages in the progressive development of legislation seeking to correct abuses which formerly existed. They carry out specifically the mandate to the legislature given by section 7, art. XI of the Constitution, that 'the legislature shall pass laws to correct abuses and prevent unjust discrimination and extortion in all charges of express, telegraph and railroad companies in this state and enforce such laws by adequate penalties to the extent, if necessary for that purpose, of forfeiture of their property and franchises.' They are, therefore, *in pari materia*, and must be construed together."

The provisions quoted from the "Railway Commission Act" went into effect 21 days later than the "Two-cent Fare Act." Do they authorize the state railway commission to increase passenger rates? The answer to this question must be found in the intention of the legislature as disclosed by all of the legislation on the subject, when viewed in the light of the constitution and the conditions requiring improvement. The power of the legislature to

fix rates or to delegate to the state railway commission
authority to increase rates already fixed by statute can-
not be questioned. After passing the act defining the pow-
ers and duties of the state railway commission, the legis-
lature at the same session enacted laws decreasing existing
express and freight rates. Laws 1907, chs. 91, 95. In
each instance power to change the rates thus fixed was
conferred in specific terms on the state railway commis-
sion. In the "Two-cent Fare Act" authority to increase
passenger rates was not granted, nor is it to be.found in
specific terms in any subsequent enactment, though the
statute prescribes penalties for violating its provisions.
Rev. St. 1913, sec. 6071. The intention to withhold from
the state railway commission authority to increase passen-
ger rates is fairly disclosed by the legislation specifically
authorizing it to increase express and freight rates, though
they had been fixed by statute; by the fixing of passenger
rates without thus authorizing an increase; by the fail-
ure of the legislature to specifically amend the "Two-cent
Fare Act," while legislating generally at the same session
on the subject of rates; by the conditions which prompted
the lawmakers to remedy existing abuses; and by the con-
stitutional provisions conferring the rate-making power on
the legislature and creating the state railway commission.

Legislation requiring railway companies to sell for $20
a book of tickets good for 1,000 miles also indicates a leg-
islative intention to withhold from the state railway com-
mission authority to increase passenger rates beyond two
cents a mile. After the passage of the act conferring on
the state railway commission in general terms power to
fix passenger rates, railway companies were required to
sell passenger transportation at the rate of two cents a
mile. Laws 1907, ch. 94. This act recognized the maxi-
mum rate fixed earlier in the session, and prescribed pen-
alties for violations of its terms, but contained no provi-
sion authorizing the state railway commission to allow an
increase. When the legislature convened in 1907, the max-
imum rate was three cents a mile. At that session, as al-

VOL. 98]          JANUARY TERM, 1915.          571

State, ex rel. Missouri P. R. Co., v. Clarke,

ready stated, the maximum was reduced to two cents a mile.

All of the legislation, both specific and general, relating to rates and to the powers and duties of the state railway commission may be harmonized by reasonable construction. Between the earlier and later acts there is no repugnance amounting to a repeal of the former. In the "Two-cent Fare Act" the legislature dealt with a specific subject limited to passenger rates. In the subsequent act relating to the state railway commission and conferring upon it authority over rates, the legislation is general. The specific provisions control, since they are not expressly contradicted by the general terms of the later act. The specific enactment fixes a maximum rate of two cents a mile for the transportation of passengers, leaving the question of lower rates for future determination. The general power of the state railway commission, as applied to passenger traffic, is limited to rates below the maximum fixed by the two-cent fare law. The legislature, in specifically fixing a maximum passenger rate and in conferring generally upon the state railway commission power to regulate or abolish passenger rates, left the state railway commission free to change or abolish rates within the bounds thus set by the lawmakers. This view of all of the legislation harmonizes it, gives effect to all of the acts, and makes resort to repeal by implication unnecessary. Intention, rather than expediency or legislative wisdom, is the end sought in construing and in giving effect to statutes. The principles applicable to the present inquiry were recently stated by Judge Morris of the supreme court of Indiana in the following language:

"As applied to the question of an implied repeal of an earlier by a later act of the same session, it is held that the later act, if in general terms, and not expressly contradicting the provisions of the earlier one, shall not be considered as intended to affect its more particular and specific provisions, unless absolutely necessary to hold otherwise in order to give any meaning at all to the words of the later act. * * * The reason for such rule is clear.

In passing the special act, the minds of the legislators were necessarily directed to the details of the special case, and it is not probable that they should intend, by a general act, to derogate from that which they have carefully supervised and regulated. * * * Where a particular intention is expressed in an act, which conflicts with a general intention expressed in a later one, the particular intention shall be given effect, leaving the later act to operate only outside the scope of the former." *Cleveland, C., C. & St. L. R. Co. v. Blind,* 182 Ind. 398, 423.

For these reasons, the state railway commission properly declined to entertain the application having no purpose except to increase passenger rates beyond the limit fixed by statute.

WRIT DENIED.

SEDGWICK, J., dissenting.

The relator, the Missouri Pacific Railway Company, filed a petition with the state railway commission asking for permission to increase its passenger rates. The commission dismissed the petition for want of jurisdiction, on the ground that the statute fixes the rate and the commission has no power to investigate the matter. Thereupon the railway company applied to this court for a writ of mandamus requiring the commission to entertain jurisdiction and hear its petition. The question thus presented is whether the state railway commission has jurisdiction to make investigation as to the charges of the railway companies for intrastate transportation of passengers.

At the general election in the fall of 1906 an amendment to the constitution was adopted creating a state railway commission, imposing certain duties upon the legislature in regard thereto, and in the meantime conferring certain powers and duties upon the commission so created. The amendment is section 19a, art. V of the Constitution, and is as follows: "There shall be a state railway commission, consisting of three members, who shall be first elected at the general election in 1906, whose terms of office, except those chosen at the first election under this provision, shall be six years, and whose compensation shall be fixed by the

legislature. Of the three commissioners first elected, the one receiving the highest number of votes shall hold his office for six years, the next highest four years, and the lowest two years. The powers and duties of such commission shall include the regulation of rates, service and general control of common carriers as the legislature may provide by law. But, in the absence of specific legislation, the commission shall exercise the powers and perform the duties enumerated in this provision."

Pursuant to this amendment, there was introduced in the house of representatives by the joint committee on railroads, on the 11th day of February, 1907, a bill entitled: "A bill for an act creating and defining the powers, duties and qualifications of the state railway commission and the secretary thereof and fixing their compensation; defining railway companies and common carriers, regulating the same, and providing the method of fixing, establishing, publishing rates, charges and classification for the transportation of passengers, freights and cars, including joint through rates and joint traffic arrangements, over and upon the various lines of said railway companies and common carriers in this state; the method of making, establishing and enforcing the general orders of said commission; defining unjust discriminations; to provide penalties for the violation of the provisions of this act, and to repeal all acts or parts of acts in conflict herewith, and to declare that an emergency exists."

Also on the 6th day of February, 1907, there was introduced in the house of representatives by the joint committee on railroads a bill entitled: "A bill for an act to amend sections 10058 and 10059 of Cobbey's Annotated Statutes for the year 1903, to fix a maximum passenger rate and to repeal said sections." This latter statute was duly enacted, and was approved by the governor on the 6th day of March, 1907. Laws 1907, ch. 92. It contained an emergency clause, and took effect March 6, 1907. The railway commission act was approved on the 27th day of March, 1907. Laws 1907, ch. 90. It also contained an

emergency clause and took effect on the day of its approval.

The regulation of rates is a difficult and complicated matter. It involves the consideration of values and other things which the legislature itself is without necessary facilities to ascertain. The legislature, realizing this, and knowing the purpose of the people of the state in providing a state railway commission, has supplied these facilities in detail to that commission and made liberal appropriation for that purpose. If the legislature has power under the constitution to regulate rates without the assistance of the railway commission, it will not be considered to have done so unless that intention is expressed in direct and unequivocal language. These two statutes were pending before the legislature and were being considered at the same time; they were considered together. The two acts must be construed together as one act, and we must consider the rate statute as if it had been inserted as a part of the commission act; then we should harmonize the whole and derive the intention of the legislature therefrom.

In *Chicago, B. & Q. R. Co. v. Winnett*, 89 C. C. A. (U. S.) 222, it was said: "The legislature would have full power to delegate to the Nebraska State Railway Commission the authority to fix rates for the transportation of passengers and freight by common carriers within the state of Nebraska if the constitution were silent upon that subject." The constitutional amendment contemplated that the regulation of rates and general control of common carriers would be delegated to the commission, and the presumption arises that the legislature, even if it retained the power to fix rates independently of the commission, would in the first instance delegate all such powers to the commission. If, therefore, the language of the legislature subsequent to the amendment of the constitution is ambiguous or of doubtful meaning, it should be considered as delegating such powers.

The supreme court of Missouri, in construing a somewhat similar statute, used the following language, which seems to be pertinent here: "Therefore it follows that, if

the hand of the legislature by former acts was so laid on rates that no power existed to increase a hard and fast maximum general statutory rate (established to cover all cases and arrived at by legislative guess, however intelligent the guess may be, as seems to be the case at the time the utilities act was passed), the conclusion is irresistible that the legislature intended its hand should be lifted, and that by general rules and methods prescribed for the guidance of the commission, as here, it was intended that it first ascertain the facts and next should apply them in regulating rates, up or down. * * * Moreover, it was recognized that a mere legislative opinion on what a just rate should be (with the chance of the facts upon which the opinion was based being found nonexistent or untrue in part by the courts) was an uncertain and unscientific basis for a rate, although the right under the police power to prescribe rates is taken as a legislative right. The history of the times shows (and we have no call to pretend ignorance therein) that a scientific plan of valuation of railroad properties actually used in the public service has come to be deemed an essential element at getting at just compensation, thereby excluding fictitious or sentimental values, mere 'wind and water,' on one side, and including actualities, on the other." *State v. Public Service Commission*, 259 Mo. 704, 725. As was said by the supreme court of Florida: "The complex and ever-changing conditions that attend or affect the performance of the useful public service rendered by common carriers, make it impracticable for the legislature to prescribe all the necessary rules and regulations." *State v. Atlantic C. L. R. Co.*, 56 Fla. 617, 32 L. R. A. n. s. 639.

Subdivision *b*, sec. 2 of the commission act (Laws 1907, ch. 90) gives the commission general control over common carriers, including the "power to regulate the rates and services." There is, of course, no doubt that the legislature may delegate to the commission such power to fix rates as the legislature itself possesses. If we consider that the constitutional amendment left with the legislature the general power to supervise and control the regulation of rates,

and also consider that conditions upon which the reasonableness of rates depends are continually changing, so that a rate fixed in 1906 might soon become unreasonable, as either too high or too low, it might well be expected that the legislature would fix a rate which should control until the commission could investigate conditions and exercise the comprehensive power devolved upon it by the constitutional amendment and perform the duties specifically imposed upon it by the legislature itself. This intention of the legislature that the rates so fixed should be investigated by the commission from time to time is fully stated in the title of the act and is plainly expressed in the commission act itself.

We have seen that subdivision *b,* sec. 2 of the act, provides that the commission shall have power to regulate the rates and service of common carriers. Subdivision *d* provides that the commission "shall have the power, and it shall be its duty to make all necessary classifications and to fix all necessary rates, charges and regulations to govern and regulate the freight *and passenger tariffs* of railway companies and common carriers." This seems to be a direct and positive declaration of the commission act itself that the power and duty of the commission to investigate and determine the reasonableness of passenger rates is conferred and continued by that act. Section 5 of the act makes it the duty of all common carriers to file with the state railway commission all freight and passenger schedules of rates as herein provided for, "and afterwards, if they deem advisable, they may make partial or special classifications for all or any of the railroads subject hereto, and fix the rates to be charged by the roads therefor; and such classifications and rates shall be put into effect in the manner provided for general classifications and schedules of rates. The commission shall have the power to *alter, change, amend or abolish any classification or rate when deemed necessary,* and such amended, altered, or new classifications *or rates* shall be put into effect in the same manner as the originals. The said railway commission shall fix as soon as practicable thereafter a schedule

and classification of rates and charges. * * * A copy or copies of said schedule or any part thereof when duly authenticated shall be received in evidence in all courts in this state without further proof as *prima facie* evidence that the rates therein contained are those fixed by said railway commission and that said rates are, *prima facie, just* and reasonable." The same section also provides that any rates fixed by the commission in said schedule may, upon the complaint of any person, be changed, and such change shall govern the common carriers. There can be no doubt, when the title of the act, the preceding sections, the general powers of the commission, and the nature of their duties defined in the constitution are considered, that these sections refer to and include passenger rates. If any doubt still existed, it is removed by the following sections of the act. Section 8 of the act provides that the common carrier shall "print and keep for public inspection schedules showing the rates, fares and charges for the transportation of passengers and freight which have been fixed and established as herein provided, and which are in force at the time upon its railroad or railroads." This section declares as plainly as words can that the rates mentioned in the preceding sections, and by those sections expressly required to be fixed by the commission, include passenger rates as well as all others. Section 13 of the act imposes a penalty upon any railroad or common carrier that "shall charge, collect, demand or receive * * * a greater rate, charge or compensation than that fixed and established by the railway commission for the transportation or freight and passengers, or cars." This section is, of course, intended for continued application in the future. It provides no penalty for disregarding rates fixed by the legislature, but expressly fixes a penalty for charging a higher passenger rate than is fixed by the commission. If the commission should name 2½ cents as the passenger rate, this statute would apply, and to charge more than the rate so fixed by the commission would be criminal; but no penalty is incurred by charging more than the rate named in

98 Neb. 37

578    NEBRASKA REPORTS.    [VOL. 98

State, ex rel. Missouri P. R. Co., v. Clarke.

the so-called passenger rate statute. Yet it is decided that the commission cannot fix passenger rates.

Subdivision *c*, sec. 15 of the act, makes it unlawful for any "railway company or common carrier to change any rate, schedule or classification until application has been made to the railway commission and permission had for that purpose." This implies that upon such application and permission any rate can be changed, and plainly provides that the commission may investigate upon application and fix and establish rates "for the transportation of (both) freight and passengers."

The constitutional amendment required the legislature to provide by law for the regulation of rates of service and general control of common carriers. In obedience to that requirement, they enacted this comprehensive statute for that purpose, as the title shows. In that act they provided again and again that the commission should investigate and fix passenger rates. It seems that the very fact that the legislature reiterated this command to the commission to fix passenger rates has weakened the command itself. The direct and unequivocal language of the legislature (section 5): "The commission shall have the power to alter, change, amend or abolish any classification or rate when deemed necessary, and such amended, altered, or new classification or rates shall be put into effect in the same manner as the originals," is now disregarded or annulled. If the commission can "abolish" any rate, and make a new one and put it into effect, an oversight of the legislature, if any there be, in some minor act, and failure to make the language of such minor act definite, cannot surely overrule the plain language, as well as the whole tenor and effect, of the comprehensive commission act, as well as the spirit and intention of the constitution itself. The legislature knew that conditions are continually changing, and that any rate fixed might become too high or too low upon change of conditions. There was therefore incorporated in the commission act the direct and positive provision that the commission shall have power to alter, change, amend or abolish any rate when deemed necessary

(section 5), which is a direct declaration that rates then or at any future time prescribed by the legislature would be temporary and might be changed by the legislature or investigated by the commission.

The fifth paragraph of the syllabus of the majority opinion, and the authorities cited supporting it, have no application in this case. The general commission act is not to be construed separately as a later act. The two acts are to be construed together as one act, as the majority opinion itself declares. The passenger rate act is not "in conflict with a general intention expressed in a later enactment," but is in harmony with it, being intended to operate only until the commission can perform the comprehensive duties imposed upon it. Since the two statutes are to be construed together as one act, the construction given them by the majority opinion creates the situation of inconsistent provisions of the same act. In such case, if the provisions are in fact inconsistent, the latest expression controls. This rule is universal.

The majority opinion says that the legislature has "left the state railway commission free to change or abolish rates within the bounds thus set by the lawmakers;" that is, if the application had been to lower the passenger rate, the commission would have jurisdiction, and therefore the duty, to investigate conditions. This duty of the commission is not in the rate act. It must therefore be derived from the comprehensive commission act.

All agree that the two acts should be construed together, and both enforced, if possible. The complete commission act is so plain that its meaning cannot be misunderstood. It requires the railway commission to make schedules of rates, including passenger rates, and revise them from time to time, and ought to be enforced, if possible. Passenger rates, in the nature of things, cannot be permanent. If there was no railway commission, such rates would have to be revised from time to time by the legislature itself. The legislature has already found it necessary to change the rate. The statute fixing the rate at two cents was intended as a temporary act until necessary investigations

580          NEBRASKA REPORTS.          [VOL. 98

State, ex rel. Missouri P. R. Co., v. Clarke,

could be made and the truth learned.  To so regard it is all that is necessary to make the two acts consistent and enforce them both.  We ought to do that, and not convict the legislature of enacting at the same time two inconsistent acts.  The railway commission by express and plain provisions of the statute can investigate, make schedules of passenger rates, and can "alter, change, amend or abolish" passenger rates.  This is inconsistent with the thought that the legislature, or the commission, or anybody else, ever has made or ever will make a permanent rate.  The legislature has not taken over passenger rates to itself, with intention of itself changing or modifying them from time to time, as changing conditions require, without the assistance of the commission, or its investigation.

By construction there is added a proviso to the passenger rate act, "Provided, that the railway commission may investigate and lower this rate, but they shall never raise it," and so by construction the two statutes are made inconsistent.  It would be equally reasonable to make the proviso to the passenger rate act, "Provided the railway commission may investigate and raise this rate, but they shall never lower it."  "Alter, change, amend" can be construed to mean "raise," as well as to mean "lower."  If the legislature intended that the commission could change and alter the passenger rate only in one direction, why not say that the commission can raise the rate, but cannot lower it?  If the railway commission act is amended by construction, and the word "lower" is substituted for the words "alter, change, amend," we will have to also amend many other sections of the act.  "The railway commission shall fix as soon as practicable thereafter a schedule and classification of rates and charges, except joint rates hereinafter provided for, for the transportation of freights, passengers and cars over the various lines of railroad in this state" will have to be amended so as to read, "Except passenger rates and joint rates hereinafter provided for," and eliminate the word "passengers" where it now appears.  There are many other provisions that are entirely inconsistent with the idea that the legislature

intended to fix passenger rates permanently, so that there can be only a one-sided investigation thereof. This would be contrary to the intent of the constitutional amendment, which contemplates that the commission shall investigate all railroad rates, etc. The two statutes, as enacted, are not inconsistent, and we ought not to make them so by construction. Even if all that the commission can do is to lower the rate, they ought, at least, to entertain an application to change the rate, hear the evidence offered, and lower the rate if conditions require it. The power to lower rates includes the power to investigate conditions.

The same legislature enacted a statute to fix a maximum charge for the transportation of money or merchandise by express companies, and also an act fixing maximum rates for the transportation of certain property, and each of these acts contains a provision that the rates so fixed should continue only until the state railway commission should fix definite rates. It is reasoned from this that, since the passenger rate act contains no such provision, the fact that these two acts enacted by the same legislature expressly reserved to the railway commission power to modify the rates so fixed indicates that the legislature intended that the passenger rate should be beyond the control of the railway commission. But the two acts in question were both approved and in effect after the passage of the railway commission act, and, without such provision, reserving the investigation and control of express and freight charges to the railway commission might have indicated an attempt to deprive the railway commission of jurisdiction over such matters. No such provision was necessary in the act which was contemporaneous with the passenger rate act, and must be construed with it, and was passed before the commission act was enacted, and the fact that the legislature inserted such provisions where there might be a doubt of the legislative intention to submit all such matters to the investigation and control of the railway commission may be considered to indicate that the thought was that the two acts introduced by the judiciary committee would be construed together, and that the

comprehensive act, which became a law after the passenger rate act, and which so plainly committed to the commission the investigation and regulation of passenger rates, leaves no room to doubt the legislative intention.

The two-cent rate act of 1907 is simply amendatory of the rate fixed in a prior statute. If the prior statute had been allowed to remain without any change of rate, it would not be contended that the commission act intended to withdraw the subject of passenger rates from the consideration of the commission. The rate fixed by the former act was assumed by the legislature to be too high, and, as necessarily much time would be consumed in the investigations of the commission and revising the tariffs, the rate prescribed by the former act was changed.

Chapter 94, Laws 1907, requires railroad companies to issue and sell mileage books of 1,000 miles each. It provides that such mileage books shall be sold "for a sum not to exceed twenty dollars ($20) per one thousand miles." The intention was that this rate should correspond with the general passenger rate then in force, or which might thereafter be in force, to be abolished or amended when deemed necessary. Passenger rates must be fixed with regard to passenger service. The rate cannot be made higher nor lower than the cost of the service and reasonable profits for the purpose of equalizing a supposed deficiency or excess of earnings of the freight service. The supreme court of the United States has so decided. "The outlays that exclusively pertain to a given class of traffic must be assigned to that class, and the other expenses must be fairly apportioned." *Northern P. R. Co. v. North Dakota*, 236 U. S. 585, 597, and cases cited. It was therefore wholly impracticable to fix passenger rates permanently without reference to freights and other considerations, and it is incredible that the legislature ever could have attempted to do so.

When we consider the title and provisions of this commission act, and that it was considered with, and approved and took effect after, the two-cent passenger rate act, there seems to be no doubt whatever that the legislature in-

tended that the passenger rate act should be temporary and should regulate those rates until such time as the commission might fully investigate conditions as contemplated by the legislature and establish suitable rates for the freight and passenger traffic of the railroads.·

LETTON and BARNES, JJ., concur in this dissent.