CONTINENTAL CASUALTY CO. et al. v. INDUSTRIAL COMMISSION et al.

No. 5261. Decided May 3, 1932. [11 P. (2d) 329.]

534

*Geo. H. Smith, R. B. Porter,* and *W. Hal Farr,* all of Salt Lake City, for plaintiffs.

*Geo. P. Parker,* Atty. Gen., and *M. Logan Rich,* Deputy Atty. Gen., for defendants.

WOLFE, District Judge.

Corwin R. Graves, while an employee of the Yellow Cab Company, a corporation engaged in business in Salt Lake City, Utah, on May 13, 1928, fell and broke his leg near the hip. The Continental Casualty Company was insurance carrier for the Yellow Cab Company. The commission awarded Graves temporary total compensation for this accident, which award was upheld by this court. See *Continental Casualty Co.* v. *Ind. Comm.,* 75 Utah 220, 284 P. 313. The Continental Casualty Company paid compensation to Graves from the date of his accident to January 13, 1929. On that same day Graves secured employment with the Yellow Cab & Transfer Company of Ogden, Utah, an entirely different corporation from the Yellow Cab Company doing business in Salt Lake City. Graves' wage while employed by the Yellow Cab Company of Salt Lake City was $20.80 per week. His wage while employed by the Yellow Cab & Transfer Company was $27.50 per week. On January 19, 1930, a little more than a year after he went to work with the Ogden company, he met with another accident. He did not resume his employment with the Ogden company until

some time in May, 1931, when he claimed he met with another accident. The state insurance fund was the insurance carrier of the Yellow Cab & Transfer Company. By the terms of the original award made in 1928, the Continental Casualty Company was directed to pay Graves compensation for temporary total disability at the rate of $10.73 per week from May 17, 1928, until such time as the applicant was discharged by the attending physician as being surgically healed. At the same time the order of the commission provided "that in the event that the applicant suffers any permanent partial disability as a result of the injuries sustained by him compensation shall be paid as provided by law." Graves was discharged from the hospital by his attending physician on August 17, 1928. For the injury of January 19, 1930, he was paid temporary total disability compensation by the state insurance fund to November 25, 1930. For his accident on May 28, 1931, he was paid temporary total disability compensation for four weeks and two days. There is nothing in the record to show the character of the injury suffered on January 19, 1930, nor is there any evidence in the record respecting the injury suffered in May, 1931. The commission held a hearing on October 7, 1931, at which it determined that the permanent partial disability suffered by Graves by reason of the three accidents was 80 per cent of the total loss of use of the left leg, and assessed the Yellow Cab Company and its insurance carrier, the Continental Casualty Comany, with 25 per cent of this 80 per cent. The commission at this hearing on October 7th permitted to be introduced a report of the medical advisory board made on January 16, 1931, in which the advisory board concluded that the disability of the left leg would be permanent and was 80 per cent of the entire loss of use. The plaintiffs had no notice of any hearing, nor is it shown that there were any hearings on the matter of the injuries of January 19, 1930, and May 28, 1931. Plaintiffs had no notice of the conclusions of the medical advisory board until the hearing of October 7th. A number

of exhibits were introduced, such as reports from Dr. Dumke of Ogden regarding the injury of January 19, 1930, employer's reports of injuries of January 19, 1930, and May 28, 1931, and a number of letters written by the applicant to the commission, from the commission to the applicant, from the commission to the Continental Casualty Company, from the Continental Casualty Company to the commission, from the commission to the state insurance fund, and from the state fund to the commission, etc. Much of this correspondence dealt with the matter of arranging conferences between the Continental Casualty Company and the state fund for the purpose of determining whether an agreement could be arrived at as to the amount of permanent partial disability with which the casualty company should be charged. But the casualty company maintained throughout that it had nothing to do with the permanent partial disability, maintaining that it had fully discharged its obligation when it paid the temporary total up to January 13, 1929. Plaintiffs asked for a rehearing after the award of October 31, 1931, upon its hearing of October 7, 1931. This was denied by the commission, and a writ of review sued out to this court and by this court granted. As a basis for the prayer for the annulment of the award of October 31st, plaintiffs complain that the award was unlawful for the following reasons: (1) That the commission was without jurisdiction of the subject matter of the alleged hearing at Salt Lake City on October 7, 1931, and erred in assuming such jurisdiction; (2) that on said date no application was pending for compensation; (3) that the hearing on the second injury of January 19, 1930, was had without notice to petitioners and without their being parties thereto, and therefore is not binding upon them; (4) that the finding of the commission that the applicant received injury on May 28, 1931, and was entitled to compensation is not binding on the plaintiffs; (5) that the commission erred in its finding that the applicant was temporarily totally disabled from May 13, 1928, to January 13, 1929; (6) that the

commission erred in finding (a) that the permanent partial disability from the three accidents was 80 per cent loss of use, and (b) that 25 per cent of said total loss of use was caused by the accident of May 13, 1928; (7) that the commission erred in finding the applicant 80 per cent disabled by reason of the said three injuries, because there is no competent evidence of any causal connection between the first injury and the latter two, and for the further reason expressed in grounds (3) and (4), and further that the state insurance fund assumed the sole liability for the results of the said two last injuries; (8) that the commission erred in finding that the applicant suffered a permanent partial disability of 20 per cent (25 per cent of 80 per cent) by reason of his injury of May 13, 1928, for the reason that there is no competent evidence to sustain said finding; and (9) that the commission erred in admitting the report of the medical advisory board made on January 16, 1931, because (a) said report is based on applicant's alleged condition after he had received the second injury, which it is claimed had no connection with the first injury and because (b) the petitioners had no knowledge of said report or hearing upon which its is based, and therefore (c) the commission erred in admitting said report because it is not competent evidence.

The first question which confronts us, and the one which will be decisive of a number of the questions raised by the assignment of errors set out above and contained in the application for a writ of review, may be stated as follows: Did the hearing held on October 7, 1931, endeavor to determine (a) the extent of two separate permanent partial disabilities, each independent of the other, or (b) the question of whether the first fracture was a causative factor in a single final permanent partial disability, and, if so, the extent to which it contributed? Stated in another way: Did the commission endeavor to determine (a) the extent of the permanent partial disability which had become fixed after the injuries due to the first accident were surgically healed

and after the period of temporary total disability resulting from the first accident had terminated, that is, the permanent partial disability as of January 13, 1929, and then further endeavor to discover the extent of a second permanent partial disability arising from a second and third accident as independent facts, or (b) did it treat the final permanent partial disability as a single disability and then endeavor to determine whether and the extent to which, if at all, the first injury contributed to and entered as a causative factor in said final permanent partial disability status?

Perhaps the distinction in the two methods of approach may be illustrated by a homely example: Supposing the end of an auto bumper is bent back by an offending car. Later another offending car bends the same end back at the same place a further amount. Under this state of facts at least two inquiries are possible. The first, How much did the first offender bend it back independently of any subsequent damage? And then, How much did the second offender bend it back as an independent fact unrelated to any former damage? These two damages arrived at as independent facts would equal the sum and total of the amount at which the bumper end had been bent back and in determining how much each offender had bent the bumper would be treated just as if the damages had occurred to different ends of the bumper, instead of being superimposed, one upon the other, although the determination of the amount each car had bent the bumper might be combined in a single hearing with both parties present, and although the amount each offender had bent the bumper end back might be expressed in percentages of the entire amount of the bending. And in this method of approach the second bending could be found in two ways, first, in finding the extent of the first bending independently of the second and then finding the extent of the second and adding it to the first to obtain the total bending, or the first could be found independently and the final total bending ascertained and the first bending subtracted from it to ascertain the amount of the second bend-

ing. Whichever method is adopted, it is plain the extent of the first bending is found independently of the final total bending, and independently of the amount of the second bending, and any error in finding the total bending and/ or the second bending could not affect the first offender. The second sort of inquiry which could be conducted would be to ascertain the first damage and the final or total damage or bending, and then determine, not only the bending chargeable to the first offender, but the additional and more highly complicated fact of whether and, if so, how much the first bending had contributed to or was a causative factor in the second bending. For instance, if the second offender maintained that, if the first offender had not put the bumper in a certain state, the impact of his car would not have caused an additional bending to the same extent as if the bumper had not been previously bent, we can see that there would be an endeavor, not only to hold the first offender for just the amount of his damage as a proportion of the whole damage, but, in addition, for some of the second damage, because the first damage was also a contributing factor to the second. And in such case the first offender would be vitally interested in every phase of both the first and second damages, and, if any error crept into the whole inquiry, he could take advantage of it. The analogy is now clear. If the commission was determining the extent of the permanent partial disability as of January 13, 1929, independently of the final permanent partial disability, and independently of such fact of such permanent partial disability in determining what portion the former was of the latter, that is, measuring the former in terms of percentage of the latter, any error committed by the commission in determining the fact of ultimate permanent partial disability would not affect the plaintiffs. If, on the other hand, the commission was endeavoring to determine whether the first injury contributed to or was a causative factor in the permanent partial disability, and *did find that it was,* then certainly any material error committed

by the commission in the determination of such fact would substantially affect these plaintiffs. In short, if the commission was proceeding in accordance with arm (a) of the alternative above propounded question, then plaintiffs would not be concerned with the evidence of what came after January 13, 1929. It is as if the commission were determining the permanent partial status of the applicant on October 7, 1931, as of January 13, 1929, the date of the hearing alone being postponed. The commission could have done exactly the same thing on January 14, 1929. If, however, the commission proceeded on the theory expressed in arm (b) of the above propounded alternative question, then evidence af all the contributing causes to the final permanent partial disability treated as a single integral whole would affect the plaintiffs. If the commission proceeded in accordance with arm (a) of the above propounded alternative question, then grounds 3, 4, 6a, 7 and 9 urged for nullification are eliminated and grounds 1, 2, 5, 6b, and 8 only remain for discussion.

Upon a careful reading of the record, we are convinced that the commission set out to determine the question of whether the first injury contributed as a causative factor to the final permanent partial disability status and the extent to which it so contributed, if at all, but, as the record reveals, there was no evidence that the first injury was a causative factor so that the commission was compelled to and did fall back into determining the permanent partial disability status as of January 13, 1929, due from the first injury, and found what it considered to be such permanent partial disability, and then expressed it in terms of the percentage of the final permanent partial disability, just the same, as far as these plaintiffs are concerned, as if it had held the hearing on January 14, 1929.

From the fact that the commission made an award of 25 per cent of the 80 per cent disability it appears at first to indicate that the commission was taking into account the

first injury as a causative factor in the final permanent disability. But the fact that it may have measured the percentage of the permanent partial disability of January 13, 1929, in terms of a final and greater permanent partial disability, is not conclusive. In fact, 25 per cent of 80 per cent is 20 per cent permanent partial disability. The commission could have expressed it in terms of permanent partial disability as compared to no disability; that is, expressed it as 20 per cent permanent partial disability instead of expressing it in terms of the final permanent partial disability. Twenty per cent permanent partial disability would mean a 20 per cent loss of use of the left leg based upon the use of a good left leg. Twenty-five per cent of 80 per cent means exactly the same thing, because 25 per cent of 80 per cent loss of use as compared with the use of a good leg is 20 per cent of the loss of the use of a good leg.

The record shows that there is no evidence of the first injury being a causative factor in anything but the temporary total disability loss up to January 13, 1929, and the permanent partial disability, if any, which was found to be fixed as of that date. The fact that the commission held a single hearing in which both the permanent partial disability as of January 13, 1929, and the entire and greater permanent partial disability resulting from the subsequent two accidents were considered on intermingled evidence bearing upon both of these questions does not alter the situation. The factor which determines whether the commission found on the one hand a permanent partial disability as of January 13, 1929, as an independent fact from a final permanent partial disability, or, on the other hand, found that the injury of May 13, 1928, was a causative factor in producing not only the permanent partial disability fixed as of January 13, 1929, but a causative factor of a final, greater, and subsequent permanent partial disability, is whether the record shows any connection between the injury of May 13, 1928, and such final permanent partial disability. If the record does show any evidence of such connection, we must

presume that the commission gave effect to such evidence, and that its finding embraced a conclusion that the first injury was a causative factor in the final permanent partial disability, and that therefore, as far as these plaintiffs are concerned, it erred, because these plaintiffs would be, in that case, entitled to be confronted in a proper and competent manner with all the evidence upon which the final permanent partial disability was based. If, on the other hand, it appears from the record that there is no evidence whatsoever connecting the first injury with the final permanent partial disability or that the evidence is to the contrary so as to show nothing upon which it could be presumed that said first injury was a causative factor in the final permanent partial disability, then we must assume that the commission so found, unless the findings recorded by the commission show to the contrary.

But how stands the record in this regard? Graves testified:

"Q. Can you tell the Commission what was your physical condition with respect to recovery as incident to the accident suffered and paid for by the Continental Casualty Company (the first injury)? A. I had a shortened leg, somewhere around an inch or a little better short resulting from the first fracture, and the result in the legs were not a normal condition by any means. They were, the muscles in the leg were, somewhat degenerated or shrunken in a condition where it was impossible to move the leg quickly in order to catch yourself in case of a stumble.

"Q. Were you in as good condition as you were before the accident suffered by the Continental Casualty Company? (Meaning, we suppose, suffered while the employer was under coverage of the Continental Casualty Company.) A. I feel honestly that I was not in anywhere near as good condition because I could not do any manual labor which I had done always up until I was first injured.

"Q. How do you reach such conclusions? A. By the actual daily experience. I could not walk except with the use of a cane."

This is the only evidence of Graves regarding permanent partial disability of the first accident. He does not testify anywhere, as indeed he hardly could, as to any causative

connection between the first injury and the final permanent partial disability. His evidence consequently must be considered as entirely severable from the testimony going to a final permanent partial disability and only as supporting a finding of the permanent partial disability fixed at the end of the temporary total disability resulting from the first accident. There were two other witnesses testified, Drs. Kerby and Ossman. We shall set out portions of their testimony at this time, as we will find it of use not only in connection with the question we are now considering but with other questions to be later considered in this opinion.

An examination of the testimony of Drs. Kerby and Ossman discloses nowhere that the first injury in any way aggravated the preexisting diseased condition of the hip so as to make the first injury a causative factor in the final permanent partial disability. In fact, the evidence of Dr. Ossman, who treated the patient during the period of disability resulting from the first injury and who discharged him from the hospital as being surgically healed, shows just the contrary. Dr. Ossman testified in this regard as follows:

"He was discharged from my care at the hospital on the 17th of August, 1928 * * *

"Q. Is it your opinion that the diseased condition of the bone existed prior to the fracture? A. Yes, there is no doubt but what is existed prior to the fracture.

"Q. Was there some evidence of it being long-standing? A. You would rather think so from the appearance of the bone in the X-ray.

"Q. Was the bone in that condition—would it be liable to refracture more easily than a good healthy bone? A. Yes, sir.

"Q. Have you examined the X-ray picture with respect to the subsequent fracture sustained by Mr. Graves of which he now complains? A. Yes, sir.

"Q. What would you say with respect to there being any connection between the fracture of 1928 and the fracture of which he now complains? A. The subsequent fracture occurred at a lower level, occurred at the lower end of the growth, below the trochanter, whereas the original fracture was above at the base of the neck. * * *

"Q. From your examination, would you say there is any connection at all between the first fracture and the second? A. No., I think there is no connection at all. * * *

"Q. Now then, from your examination of the patient and the X-rays at the time he was discharged as I understand you he determined that there had been complete union of the fracture? A. Yes, sir.

"Q. And that the leg or the neck of the femur there was in as good condition as it was before? A. So far as the fracture is concerned. The diseased condition of the bone was constantly present.

"Q. Yes, but taking that into consideration there had been as good union as could be had under the circumstances? A. Yes, my record shows that there was good union, and the hospital records showed by measurement of the leg—showed that there was no shortening at the time of his discharge from the hospital. In other words we considered it very satisfactory so far as the fracture was concerned.

"Q. Of course you don't think the fracture was the cause of the disease? A. No.

"Q. The disease had been progressive and had been there apparently for some time? A. Yes, what we speak of as a pathological fracture * * *

"Q. Do you think that the fractures in any way accelerated a pre-existing condition? A. I don't believe the first fracture did because of the fact he secured a substantially firm union in spite of the diseased condition of the bone. I thought it was only a matter of time when the man having this disease might sustain a fracture * * *

"Q. Would you say that the fractures have nothing to do with the present disability? A. No, I would not say that because—especially the second fracture has made more disability than he would have had without the fracture, because it has shortened the limb.

"Q. What would you say would be the percentage of disability that could be reasonably charged to the first injury? A. I don't know that I could answer that because the disability is largely a disability from the disease and not from the injury.

"Q. Assuming that this was an aggravation of a pre-existing condition? A. I don't think the first fracture was an aggravation of a pre-existing condition. I think the fracture was merely incidental in the progress of the disease.

"Q. Would you say if he hadn't had the second fracture and if he hadn't had this disease he would have had no disability as a result of the first fracture? A. Apparently he had recovered.

"Q. Would he have had any permanent disability if he hadn't had the disease and hadn't had the second fracture? A. Do I understand the question if he hadn't had this diseased condition of the bone?

"Q. Yes, and the second fracture—would the first fracture produce a permanent disability? A. No.

"Q. He was absolutely normal? A. In good position without deformity and no shortening. That is all we can say in any fracture. That is what we consider a complete cure.

"Q. And no lameness if he hadn't the disease? A. Yes, I think that is so.

"Q. Doctor, was there any displacement in the first fracture? A. I am only speaking from memory, Mr. Iverson, but I think there was some displacement. There is bound to be a certain amount of displacement with the original fracture, but as I recall the X-ray pictures following the reduction was that we secured an accurate reduction of the fracture."

Dr. Ossman testified further, on being pressed to interpret Dr. Kerby's testimony, that there was a 25 per cent disability of the bone due to the disease in the sense that the disease increased the susceptibility to fracture, but he was positive that the first fracture did not contribute to that susceptibility or that it had anything to do with aggravating the pre-existing condition which made the leg more liable to fracture. He stated that such susceptibility was due entirely to the pre-existing diseased condition.

Omitting those portions of Dr. Kerby's testimony which are irrelevant to the determination of the question we are now considering, he testified as follows:

"Q. Have you an opinion whether there was any permanent disability existing at the time of your last examination? * * * A. I think the man did have a permanent disability at that time.

"Q. You saw him what time? A. The date of the last X-ray films I made at the County Hospital.

"Q. Now did I understand you to say that you didn't recall the dates of the last X-rays? A. I don't recall the exact dates of it, no sir.

"Q. Now, this first injury occurred in May of 1928. Could you approximate the date with respect to the date of the injury, how long after that time? A. The first examination was made somewhere in the middle of May. I recall that because I remember the first number of it was 5 for the fifth month. Roughly speaking somewhere between four and five months.

"Q. Would it be made in 1929? A. Three to six months subsequent to the time of the first examination that was made at the County Hospital. I got those dates Sunday from the records.

"Q. You say from the first examination and X-rays you found a fracture of the neck of the femure and the lesser trochanter? A. Yes.

"Q. Approximately half or three quarters of an inch apart or possibly contiguous? A. Yes. * * *

"Q. You stated, Doctor, in answer to Mr. Iverson that there was a permanent disability. Was that disability due to the fracture or the growth, or both? A. I think any fracture of this sort, a person would have some disability, but I think his disability was greater than it would have been had the diseased condition not been present.

"Q. What is your opinion as to the degree of disability that you thought he had at that time at the hip? A. I am afraid my estimate would be of little value because it is made entirely from my memory. I would say that his disability—a very large percentage of the disability which might be stated to exist there was due to the cystic condition, or as I thought at the time it was due to a giant cell tumor, which was present in the femur. If he hadn't had this diseased condition his disability would have been 10%, *but because he had this diseased condition in the bone* which rendered him likely to receive another fracture without any trauma, or a very slight trauma, his disability was probably 25%."

The inquiry carried on solely through these three witnesses was directed toward ascertaining the permanent partial disability, if any, as of January 13, 1929, and also as to whether it entered as a causative factor in any future permanent partial disability, but the entire evidence reveals no such causative connection, and the commission must have come to that conclusion, as the findings and decision bear this out. The commission finds that, "as a result of the injury sustained on May 13, 1928, while employed by the Yellow Cab Company of Salt Lake City, the applicant was temporarily totally disabled up to and including January 12, 1929, and *as a result of said injury of May* 13, 1928, the applicant sustained approximately an inch or more of shortening of the injured left leg." (Italics ours.) The finding continues as follows: "As a result of the combined injuries sustained by the applicant on May 13, 1928, January 19, 1930, and May 28, 1931, the

applicant sustained 80 per cent permanent loss of use of the leg at the hip—75 per cent of the 80 per cent disability being the result of the injuries sustained during the employment of the applicant by the Yellow Cab & Transfer Company of Ogden on January 10, 1930, (apparently should be January 19, 1930) and May 28, 1931, and 25 per cent of said 80 per cent permanent partial loss of use of the left leg being the result of the injury sustained by the applicant on May 13, 1928, while employed by the Yellow Cab Company at Salt Lake City, Utah." The loss of use of the leg as of January 13, 1929, being ascertained independently of the subsequent final loss of use, the loss of use from the two latter accidents of January 19, 1930, and May 28, 1931, is a deducible fact. It is found by taking the whole final loss of use and subtracting the loss of use found independently to have occurred by reason of the accident of May 13, 1928. The fact that it was translated and expressed in terms of an entire final permanent partial disability, as pointed out in the beginning of this opinion, could make no difference. It is quite apparent that there was no evidence of any connection between the first injury and the final permanent partial disability, and consequently it must be assumed, and it seems necessarily inferable from the finding and decision of the commission, that what the commission did was to find in one hearing two independent facts. If the permanent partial disability of January 13, 1929, was found as an independent fact, and there was no evidence that it was a causative factor in the final loss of use, and no finding that it was such, and no such finding involved or embraced in the decision, then any incompetent evidence upon which the 80 per cent was based, and consequently upon which the deduced fact of loss of use due to the two latter accidents was based, cannot possibly affect these plaintiffs. It follows, therefore, that grounds 3, 4, 6a, 7, and 9 are not well taken because either the errors assigned, if any, cannot affect the plaintiffs or because these plaintiffs were not or would not be concerned in the result

of said acts of the commission whether erroneously committed or otherwise.

It remains to consider grounds 1, 2, 5, 6b and 8. Assignment No. 5 that the commission erred in its finding that the applicant suffered temporary total disability from May 13, 1928, to January 13, 1929, was in the case only by way of inducement to the finding of permanent partial disability of 20 per cent loss of use and does not appear in the conclusion or decision. Moreover, plaintiffs had already paid this compensation, so that the finding was only confirmatory.

Grounds 6b and 8 raise substantially the same point, to wit, that there is no competent evidence to support the finding of a 20 per cent loss of the total function of the left leg as of January 13, 1929. This brings us to the question as to whether there is sufficient competent evidence to support the finding of the commission that independently of the 80 per cent final loss of function there is a permanent partial disability of 20 per cent as of January 13, 1929. In considering the question upon which theory the commission proceeded and what fact it really ascertained, we quoted practically all of the evidence which bears directly upon the question as to whether the commission could competently find a permanent partial disability as of January 13, 1929. Dr. Ossman, who treated applicant until August 17, 1928, which is the date of his being discharged from the hospital as being surgically cured, and saw him thereafter at least as late as September 29, 1928, and according to the applicant's testimony as late as May, 1929, and who measured his leg when he was discharged from the hospital and who found a complete bony union of the fracture and no shortening of the leg, testified that in his opinion the applicant had no permanent loss of use due to the fracture and no aggravation of the disease due to the fracture. In his opinion, any loss of use was due to the fact that the applicant, *owing to disease,* had great susceptibility to fractures. He advised a cane as a precaution, not in order to walk, but in order to protect the

leg against future fractures. This necessity to use a cane because of susceptibility to fracture might, in that sense, prevent as great a functional use of the limb as a normal limb in regard to which care did not have to be exercised, but such functional circumscription, if as great as 25 per cent, came only from susceptibility to fracture caused by the disease and not because of any fracture. A careful reading of all of Dr. Ossman's testimony is capable of no other meaning. Nothing is gained by extracting from the total evidence a single phrase of answer seeming to veer toward a different conclusion.

Graves, the interested applicant, testified as quoted above in this opinion and consequently just opposite to Dr. Ossman, who measured his leg and found no shortness.

Dr. Kerby testified from a memory refreshed from a report in the County Hospital formerly dictated by him as to indications shown by X-ray films made back in 1928 but later lost. He became confused during a portion of his testimony by taking into consideration his recollection of indications shown by films taken by Dr. Dumke of Ogden after the second accident, which he had perused sometime before the hearing. He corrected himself by saying that, "My estimate would be of little value because it is made entirely from my memory," and as shown by the evidence a confused memory at that. His testimony regarding his estimate of disability is quoted earlier in this opinion. If the applicant "hadn't had this diseased condition his disability would have been 10%, but because he had this diseased condition in the bone which rendered him likely to receive another fracture without trauma or slight trauma, his disability was probably 25%." The doctor nowhere testified that in his opinion the first fracture aggravated the disease and thus contributed to the susceptibility which the disease gave the limb to further fracture. Throughout, it is quite clear that he did not think that the fracture had anything to do with the disease. He says: "The fracture did not cause the disease. The disease antedated the frac-

ture." He says, in answer to the question, "Have you an opinion whether there was any permanent disability existing at the time of your last examination?" "I think the man did have a permanent disability at that time." But it does not appear clearly when his last examination was made, whether after the first or second fracture, so it does not appear clear what he means by the phrase "at that time"— certainly the applicant did have a shortening of the leg after the second fracture, but Dr. Kerby did not examine the patient personally but only different sets of X-rays. He thought such examination was made three to six months after the first examination, which was made in May of 1928, thus bringing the last examination in the latter part of the year 1928, which was more than a year before the second fracture. Consequently Dr. Kerby's testimony may be taken as some evidence of a permanent partial disability as of January 13, 1929, but we do not believe that his testimony could be pushed beyond the 10 per cent disability due to fracture. It is quite apparent that he thinks 15 per cent is due entirely to the disease independent of the fracture.

It thus transpires that there is a conflict between Dr. Ossman and the applicant as to an actual shortening of the leg as of January 13, 1929, and thus competent substantial evidence to support the finding of permanent partial disability is not lacking, regardless as to what relative weights we might ourselves have given to the testimony of these two persons; and, in addition, there is some rather unreliable testimony of Dr. Kerby as to a "disability" (whether a physical shortening, does not appear) in the amount of 10 per cent, or, translated into terms of the portion of the final permanent partial disability, 12½ per cent of 80 per cent. This is all the testimony in the record on the actual extent of the first permanent partial disabilty. Therefore, there is sufficient competent evidence to support a finding of permanent partial disability as of January 13, 1929, that is, before the next accident, but no evidence to

support a finding that it was a 20 per cent disability or, what is the same thing, 25 per cent of 80 per cent. The plaintiffs must therefore prevail on the grounds above denominated as to 6b and 8.

If this were the end of the case, we would sent the record down with an order for the commission to take appropriate proceedings in view of the evidence. There are, however, two other grounds on which claim for annulment is based and which must be considered before the commission can be properly advised as to the law of this case. We refer to grounds 1 and 2 to the effect that the commission did not have jurisdiction to hear on the 7th day of October, 1931, the matter of whether there was permanent partial disability as of January 13, 1929, and, second, that no application was pending on October 7, 1931, for such compensation. These two must be considered together.

If the hearing of October 7th can be considered as having proceeded under a new application, then, if the first permanent partial status (which is the only status with which the plaintiffs under the evidence are concerned and in regard to which, under the state of the evidence, they could be bound) became fixed as early as January 13, 1929, the date which, at all events, the temporary total disability ceased, it would appear that the statute of limitations has run as to such claim. The fact that a change in the condition of the applicant occurred due to subsequent accidents while under other employers cannot alter the situation as far as these plaintiffs are concerned, because there was no causative connection between the first injury and the two subsequent injuries, and consequently any change of condition after January 13, 1929, is not referable to the first injury. Consequently it stands that the commission having, as far as these plaintiffs are concerned, made a finding only as to the permanent partial status as of January 13, 1929, and that no change of condition was shown or in fact could, with such evidence as was introduced concerning the final status, have been shown so as to be bind-

ing on these plaintiffs as resulting from the first accident, the statute must have run if the hearing of October 7, 1931, is to be considered as a new application for compensation for the permanent partial disability fixed as of January 13, 1929.

The Attorney General, however, contends that the application under which the temporary total disability was given gives the commission continuing jurisdiction to determine the entire compensation to which the applicant may be entitled as arising from the accident of May 13, 1928, whether temporary total or permanent ∎ partial. This we can readily agree to, provided it is determined within a reasonable time after the *condition becomes fixed*. There is no question but that the commission, after a temporary total disability is completed, has jurisdiction to determine the permanent partial disability arising from the same or ensuing causes occurring before the permanent partial disability becomes fixed. And this is the case whether the commission expressly retains jurisdiction or not. There is no question but that a single application for compensation gives plenary jurisdiction to determine the nature and extent of all forms of compensable disability resulting from the accident, and the jurisdiction continues for such period of time as is reasonably necessary to regard developments until the condition becomes fixed, and so long thereafter as may be reasonably necessary to clear up all the matters arising out of the original accident or connected therewith, but, when the status becomes fixed, then the applicant must act within a reasonable time to invoke the continuing jurisdiction of the commission. Otherwise, an applicant might come in years after to get compensation for a matter claimed never to have been settled, although the condition became fixed years before and no changed conditions are shown which can be referred to the original accident. What is a reasonable time depends on all the circumstances. In this case, the status of the applicant as far as permanent partial disability is referable

to the accident of May 13, 1928, was fixed at least by January 13, 1929.

As far as the record shows, the applicant did not make any claim or intimation of having suffered any permanent partial disability until February 13, 1930, at which time he wrote the commission that he did not want to accept a check from the Continental Casualty Company as final settlement "because I had only partially recovered the use of my leg up to the time of my present injury which occurred January 19, 1930." As far as the record shows, this was the first time he claimed any compensation for permanent partial disability resulting from the first accident. There may have been circumstances which made a delay from the date of February 13, 1930, to October 7, 1931, reasonable. He was in the hospital part of this time from a second and third injury. There were endeavors to obtain some agreement between the state fund and the Continental Casualty Company, all of which may have taken considerable time. Ample time should be allowed for such adjustment; moreover, the commission was acting in the matter through exchange of letters and in an endeavor to bring the two insurance carriers together. It was exercising an active hand. It remains, however, to see if there is any circumstance which would excuse the delay between January 13, 1929, when the disability became fixed, and February 13, 1930, when the applicant first intimated that he claimed permanent partial disability resulting from the first injury, a delay of thirteen months, and when he was working for another employer, and at such time as made it difficult to determine the status of the claimed permanent partial disability of January 13, 1929, because it then had become merged, if it existed at all, in a permanent partial disability which really seems to have arisen from the accident of January 19, 1930. A delay of more than a year after a condition has become fixed, where no reasons for such delay appear, would be an unreasonable length of time to go back and ascertain the question of whether a perma-

nent partial condition existed and the extent of it, where it appeared that the first injury had no causative connection with subsequent injuries, and where there was no change of condition in the asserted permanent partial disability which disability might have been fully determined more than a year before.

We believe there was one reason why such delay was excusable, if not in fact necessary or advisable. There was pending in this court during said time a writ of review taken from an order of the commission granting compensation for temporary total disability resulting from the first injury of May 13, 1928, whch involved the very fundamental question of whether the plaintiff in this case was at all liable for any results of that first injury. Until that was settled, it would have been inadvisable, if not inappropriate, for the applicant to obtain action on a claim for permanent partial disability and for the commission to proceed to entertain it. The decision of this court on that proceeding was not finally conclusive until January 29, 1930, about two weeks before the applicant's letter of February 13, 1930. It was when the plaintiff tendered a draft for the entire period of total temporary disability in pursuance of a decision of this court favorable to the applicant that the applicant first made his claim for permanent partial disability asserted to have resulted from the accident of May 13, 1928. The former order of the commission granting compensation for total temporary disability had expressly provided that "the Industrial Commission of Utah retains jurisdiction over this case until all proceedings are tried and all matters and things done herein to finally dispose of the same according to law." True, another accident happening on January 19, 1930, had intervened which obliterated the permanent partial disability if any, resulting from the first injury. But that difficulty could not discharge the duty of the commission or lessen the right of the applicant to determine the permanent partial disability, if any, resulting from the first in-

jury. True, the record in this case gives a distinct impression that the claim by the applicant for permanent partial disability asserted to have resulted from the first accident was an afterthought never entering his mind until after the second accident. Indeed, on the record, it appears quite doubtful whether there was any permanent partial disability, although there is, as we stated before, some competent evidence to support such finding. But, whatever inspired the claim, the fact that there was a proceeding pending in this court on the determination of which his very right to claim permanent partial disability as against this plaintiff depended, saved the applicant's right during the time elapsing between January 13, 1929, and February 13, 1930.

It therefore follows that ground No. 1, that the commission had no jurisdiction of the subject-matter on October 7, 1931, is not well laid. But, because there is no competent evidence to sustain a finding of more than a 10 per cent permanent partial disability resulting from the first accident, whereas the commission found a disability of 20 per cent. (25 per cent of 80 per cent), the award must be annulled and the cause remanded for further and appropriate proceedings. Such is the order.

ELIAS HANSEN, FOLLAND, and EPHRAIM HANSON, JJ., concur.

CHERRY, C. J., did not participate herein.

STRAUP, J.

I concur in the result. The applicant claimed four separate and distinct injuries. One on May 13, 1928, when in the employ of the Yellow Cab Company of Salt Lake, his foot, while he was descending a stairway, caught in a step causing him to lose his balance wrenching and twisting his leg in the hip joint. He continued driving his cab as theretofore. Three days thereafter, while walking on

the sidewalk to catch a street car to go to work, he, as he
testified in that case, slipped, and, throwing his weight on
the injuried leg, "the hip joint gave way and came out
while I was still standing on my feet," and that he then fell,
fracturing the neck of the femur in the hip joint. He was
allowed compensation on the theory that the injury on the
13th so weakened his leg in the hip joint that as he went
along about his work the socket of the joint "flipped out
and flipped in," and that on May 16th, while walking hur-
riedly along on the sidewalk to catch a street car, he slipped,
throwing his weight on the injured leg, and the socket
"flipped" out of the joint and he fell to the sidewalk. Ad-
mittedly the applicant for a considerable time prior to these
injuries from an osteomyelitis condition of the femur and
hip joint. On account of the fracture, he was taken to the
hospital, where he was treated. In August following he was
discharged surgically healed of the fracture, but he still
suffered from the osteomyelitis condition. For this acci-
dent the commission awarded the applicant $10.73 a week
for 36 weeks, which was paid by the Continental Casualty
Company; the last payment being made January 13, 1929.
No claim was then made, and not until long thereafter, that
the applicant was entitled to additional compensation for
that injury. On about the same day of the last payment,
the applicant entered the employ of another company, the
Yellow Cab Company at Ogden, receiving $27.50 a week,
$6.70 more a week than was received by him from his former
employer. The insurance carrier of the Ogden company was
the state insurance fund. The applicant, while working for
that company, received another injury on January 19, 1930,
a little over a year after he entered the employ of that com-
pany. He was paid compensation therefor out of the in-
surance fund for a little over 44 weeks, or until November
25, 1930. He went back to work for the Ogden company,
and sustained still another injury in May, 1931, and was
paid compensation therefor out of the insurance fund.
Neither the cab company of Salt Lake nor the Continental

Casualty Company, its insurance carrier, had any knowledge or notice of either of such last two named injuries nor of the character of them, nor was any claim made that the injuries in May, 1928, had anything to do with the injuries of 1930 or 1931. And, as no claim was then made for any additional compensation against the cab company of Salt Lake or its insurance carrier, there was no necessity of notice to either. The adjustment with respect to compensation for the injuries of 1930 and 1931 was carried on as though such matter concerned only the applicant and the cab company of Ogden and the state insurance fund. As a result of the examining medical board appointed by the commission, the commission by letter advised the manager of the state insurance fund (who also is appointed by the commission, and who and the fund are under the exclusive control and direction of the commission) that, because of the injuries sustained by the applicant in 1930 and 1931, he was entitled to additional compensation on the basis of an 80 per cent permanent partial loss of the use of his leg as a final settlement. That the manager declined to pay on the ground that the payment was excessive, because the applicant suffered a great number of years from a diseased condition of the bone of the femur and because he had sustained prior disabling injuries for which the Continental Casualty Company was liable for a permanent partial loss, suggested he was willing to negotiate with the applicant and the Continental Casualty Company for an amicable adjustment, and stated that a copy of his communciation to the commission was also sent to the applicant and to the Continental Casualty Company. In reply to that, the applicant wrote the insurance fund, thanking it for what it had done for him, expressed a willingness to negotiate the matter without further proceedings, and suggested that the Continental Casualty Company pay 50 per cent of the 80 per cent permanent partial loss. As appears, nothing further was done until September 2, 1931, when the applicant wrote a letter to the commission stating that he found it necessary to ap-

peal to it in regard "to settlement of my award for permanent disability of January 19, 1931," that the state insurance fund had offered to pay him 50 per cent of the 80 per cent permanent partial loss, that the Continental Casualty Company was indifferent to any and all negotiations in the matter, and that it be required to pay the balance of 30 per cent. It is stated by the plaintiff herein, and not denied by the representatives of the insurance fund or by the applicant, that the letters from the applicant to the state insurance fund and to the commission, were prepared for him by the representatives of the fund and signed by him. In response to the letter written to the commission, the case was set for hearing October 7, 1931, and notice thereof given to all parties concerned. The Continental Casualty Company appeared and objected to the proceedings on the ground and for the reasons stated in the main opinion. No application was made or petition filed for additional compensation in the cause wherein compensation was awarded the applicant against the cab company of Salt Lake City and the Continental Casualty Company for the injury sustained by the applicant in May, 1928. Though the letter addressed to the commission be regarded as an application for additional compensation, and though it be further regarded as made and filed in a cause pending before the commission, it is the cause in which the applicant was awarded compensation for injuries sustained by him in 1930 and 1931 while he was in the employ of the Ogden Cab Company to which the Continental Casualty Company was not a party and of which it had no notice. Hence the contention that no application was pending before the commission which in any way affected the Continental Casualty Company or conferred jurisdiction on the commission to award additional compensation against the Continental Casualty Company is, I think, well taken.