## SCRANTON LEASING CO. v. INDUSTRIAL COMMISSION OF UTAH.

No. 3127.   Decided January 29, 1918.   (170 Pac. 976.)

1. MASTER AND SERVANT—WORKMEN'S COMPENSATION ACT—CONSTITUTIONALITY. Workmen's Compensation Act (Laws 1917, c. 100), empowering the Industrial Commission to fix rates of insurance, is not unconstitutional because it interferes with plaintiff employer's right to procure from a private insurance company a policy at a rate not approved by commission. (Page 374.)

2. CONSTITUTIONAL LAW—DELEGATION OF POWER. The Legislature had the constitutional power to enact the Workmen's Compensation Act, delegating to the Industrial Commission the power to regulate rates for state and other workmen's compensation insurance. (Page 374.)

3. MASTER AND SERVANT—FIXING RATES OF INSURANCE—POWER OF INDUSTRIAL COMMISSION. Workmen's Compensation Act, section 53, subd. 2, providing for stock corporation and mutual associations engaged in the business of workmen's compensation insurance, and subdivision 3, providing that all stock corporations or mutual associations transacting the business of workmen's compensation insurance under the terms of subdivision 2 "shall be subject to the rules and regulations of the commission with respect to the rates to be charged, and methods of compensation to be used," gives the Industrial Commission power to fix the rates to be charged by stock

corporations or mutual associations transacting business of work-men's compensation insurance.  (Page 375.)

4. MASTER AND SERVANT—FIXING RATES OF INSURANCE—POWER OF INDUSTRIAL COMMISSION.  Under Workmen's Compensation Act, section 37, providing that the commission shall determine the hazards of the different classes of insurance, and fix the rates of premiums therefor based upon the total pay roll and number of employees in each of certain classes of employment at the lowest possible rate consistent with the maintenance of a solvent state insurance fund, and for such purpose may adopt a system of schedule rating, when the Industrial Commission establishes a rate for state insurance, the rate so established becomes the rate to which other workmen compensation insurers must conform.  (Page 376.)

5. MASTER AND SERVANT—WORKMEN'S COMPENSATION INSURANCE—REJECTION OF POLICY.  The Industrial Commission by virtue of its power to fix and regulate insurance rates under Workmen's Compensation Act, sections 37, 53, has authority to reject a policy issued to an employer by a private insurance company where it provides in general terms for participation by the employer.  (Page 378.)

Mandamus by the Scranton Leasing Company against the Industrial Commission of Utah.

Alternative writ quashed, and peremptory writ denied.

*Marioneaux, Straup, Stott & Beck* for plaintiff.

*Dan B. Shields,* Atty. Gen., and *James H. Wolfe* and *O. C. Dalby,* Asst. Attys. Gen., for defendant.

THURMAN, J.

The complaint of the plaintiff, in substance, alleges that plaintiff is a corporation organized under the laws of Utah and engaged in the business of mining in Tooele county, and has in its employ about thirty employees in its said business; that the Interstate Casualty Company of Birmingham, Ala., is a corporation organized under the laws of Alabama doing business in the state of Utah as an insurer of employers against loss from liability imposed upon employers under

the provisions of chapter 100, Sess. Laws Utah 1917, known as the Workmen's Compensation Act; that on or about the 1st day of July, 1917, plaintiff entered into a contract with said Interstate Casualty Company for insurance against liability under the terms of said act, and procured an insurance policy from said company, the rate of insurance therein being agreed upon and fixed at $5 for one year per $100 employees' pay roll; that said policy was presented by plaintiff to defendant on or about the 26th day of July, 1917, for its acceptance and for filing, but that defendant refused to accept or file it or otherwise recognize it at all; that defendant's reason for so refusing to accept or file said policy, as stated by it, was because the rate for ore mining was $5.59 per $100 employees' pay roll, whereas the rate provided in the policy offered for acceptance was only $5, and for the further reason that said policy contained the following clause:

"It is mutually understood and agreed by and between the company and the assured that this policy is issued by the company and accepted by the assured as a participation policy, provided the policy has run its full term herein specified."

Plaintiff then alleges, in substance, that the reasons for refusing said policy are ill founded, because said defendant is not authorized or empowered to fix the rate of insurance in a policy between the insured and the insurer, except for state insurance under the act, and that the same is true concerning defendant's refusal to accept or file the policy because of the clause making it a participating policy. It is then alleged that it is the plain duty of defendant, under the law, to accept and file said policy, as tendered, and that plaintiff has no plain, speedy or adequate remedy in the ordinary course of law. Plaintiff prayed for an alternative writ of mandate commanding defendant to immediately accept and file said policy, or show cause at a time and place specified by the court why it has not done so.

An alternative writ was issued, and the defendant appeared by its counsel, the Attorney General of the state, and demurred thereto on the grounds that the same does not state facts sufficient to constitute a cause of action.

The case was argued orally to the court many weeks ago, and reasonable time given counsel on both sides to file printed briefs. Defendant's brief was filed in due time. The brief of plaintiff has not been filed, although the time has expired, but the nature of the case and the business of the court demand that the case be disposed of without further delay.

As we understand the contention of plaintiff during the oral argument, it involves: (1) The constitutional power of the Legislature to interfere with plaintiff's right to enter into the insurance contract referred to; (2) the constitutional power of the Legislature to delegate such power to defendant; and (3) that the language of the act itself does not warrant the assumption of power exercised by the defendant. These propositions necessarily open up a wide field for controversy, and the case therefore becomes one of unusual importance.

The tendency of legislation in recent years has been decidedly along progressive lines. Many things in the way of legislation are now done and tolerated which two or three generations ago would not only have been vigorously assailed, as in contravention of the state and federal Constitutions, by the ablest exponents of constitutional law in the country, but would have been judicially condemned and declared void for the same reason. But since the period of which we speak every state in the Union, and the country at large, have made wonderful progress in nearly every department of human ·activity. New and different laws have been rendered necessary in order to keep pace with the marvelous progress to which we have referred. It must be admitted that a large percentage of what is now known as progressive legislation finds justification for its existence in the beneficial effects resulting therefrom, and the apprehensions of danger expressed in many instances have proven to be without foundation. In this connection, as apropos, we quote from an opinion of the Supreme Court of the United States, to which we will presently refer, as the leading case upon some of the most important questions involved in the present controversy. Mr. Justice McKenna, in rendering the opinion of the court in the case of *German Alliance Insurance Co.* v. *Kansas,* 233

U. S. at page 409, 34 Sup. Ct. at page 618 (58 L. Ed. 1011, L. R. A. 1915C, 1189), says:

"Against that conservatism of the mind which puts to question every new act of regulating legislation, and regards the legislation invalid or dangerous until it has become familiar, government, state and national, has pressed on in the general welfare; and our reports are full of cases where in instance after instance the exercise of regulation was resisted and yet sustained against attacks asserted to be justified by the Constitution of the United States. The dread of the moment having passed, no one is now heard to say that rights were restrained or their constitutional guaranties impaired."

The case referred to was a case in equity to restrain the enforcement of an act of the state of Kansas (Laws 1909, c. 152) entitled "An act relating to fire insurance, and to provide for the regulation and control of rates of premium thereon, and to prevent discriminations therein." Under the act the superintendent of insurance was charged with the administration of matters relating to fire insurance, as the defendant in this case is charged with the administration of matters relating to the insurance of employers under the Utah law known as the Workmen's Compensation Act, above referred to. Section 3 of the Kansas act is especially assailed in that case as being in violation of both the state and federal Constitutions. It reads as follows:

"When the superintendent shall determine * * * any rate * * * is excessive or unreasonably high, or * * * not adequate to the safety or soundness of the company, * * * he is authorized to direct the * * * company to publish and file a higher or a lower rate, which shall be commensurate with the character of the risk; but in every case the rate shall be reasonable."

From the language of the section quoted it is readily seen that the law attempts to clothe the superintendent with power to fix the rate of insurance. The power to require the rate to be raised or lowered until it is satisfactory to the superintendent undoubtedly means that he could, in the first instance, absolutely fix the rate, and it would be binding upon the company unless declared to be unreasonable.

The bill in equity, among other things, alleges that the com-

plainant, under protest, filed its schedule of rates as required by the act, and that the superintendent thereafter made a reduction of 12 per cent. from the rate so filed, whereupon the complainant notified the superintendent that it would, under protest, and reserving the rights which it had under the law, comply with the provisions of the order. It is then alleged that the superintendent is threatening to make other and further reductions and to revoke plaintiff's license to do business, etc. The bill declared the act to be unconstitutional, wherefore it prayed for an injunction against the enforcement of the law. The respondent demurred to so much of the bill as charged the act to be unconstitutional, either as to the state or federal Constitutions. The demurrer was sustained and the bill dismissed in the Kansas court. From thence complainant appealed to the Supreme Court of the United States. The opinion of the court is elaborate and well considered. Many cases are reviewed and a conclusion reached that the decree of the lower court should be affirmed.

It cannot be denied that, if the reasoning of the opinion and the conclusion reached is sound, it settles and determines conclusively the first two propositions upon which plaintiff relies in the present case. It determines the fact that the Legislature not only had the constitutional power to enact the law, but that the superintendent was clothed with power to administer it.

It must be remembered that in the present case the reasonableness or unreasonableness of the rate fixed by the state is not in question. That would present a question entirely different and one not necessary to be determined by this opinion.

The sole question presented by the two propositions above stated is the power of the Legislature to exercise the authority complained of and to delegate it to the defendant.

A dissenting opinion was filed in the Kansas case by Mr. Justice Lamar which was concurred in by Chief Justice White and Mr. Justice Van Devanter. The dissenting opinion in the very beginning distinguishes that case from the present case, and clearly indicates that, if this case were before that court, a different view would probably be taken by the justices dis-

senting.  Mr. Justice Lamar, in the first paragraph of his opinion, says:

"I dissent from the decision and the reasoning upon which it is based. The case does not deal with a statute affecting the safety or morals of the public."

That cannot be said of the statute in the present case.  Its whole purpose is the safety and protection of that portion of the public who do the work upon which the life of the community depends.  It protects the laborer; it protects his family; it protects his employer, and protects the people of the commonwealth to a great extent against the obligation of having to care for those who are unable to care for themselves.  Section 2, Honnold, Workmen's Compensation.  In all these respects it becomes a matter of public concern, and is therefore taken out of the category of mere private affairs in which the individual alone is concerned.  This is the underlying principle of such legislation which relieves it from the charge of being obnoxious to constitutional provisions intended to safeguard private rights.

For the foregoing reasons it seems to the court that the property and property rights connected with plaintiff's business are affected with a public interest. This subjects it to state superintendence and govermental control.  *Munn* v. *Illinois,* 94 U. S. 113, 24 L. Ed. 77; *Budd* v. *New York,* 143 U. S. 517, 12 Sup. Ct. 468, 36 L. Ed. 247; *Brass* v. *Stoeser,* 153 U. S. 391, 14 Sup. Ct. 857, 38 L. Ed. 757; *Citizens' Ins. Co.* v. *Clay* (D. C.) 197 Fed. 435; *Noble State Bank* v. *Haskell,* 219 U. S. 104, 31 Sup. Ct. 186, 55 L. Ed. 112, 32 L. R. A. (N. S.) 1062, Ann. Cas. 1912A, 487; *Midland Valley R. Co.* v. *State et al.,* 35 Okl. 672, 130 Pac. 803.

A careful review of the cases referred to leads to a conclusion almost irresistible that the Utah Workmen's Compensation Act, the validity of which is in question in this proceeding, is not repugnant to the state or federal Constitution in the matters complained of.  The conclusion is also       1, 2 equally irresistible that the Legislature had the constitutional power to enact the law and to confer upon the Industrial Commission the power to do the things of which the plaintiff complains.

The next question therefore is: Does the law confer upon the commission the power to fix the premiums or rate to be charged for insurance in cases within the contemplation of the act?

Section 53, subd. 2, of the act provides for stock corporations and mutual associations engaged in the business. The last paragraph of subdivision 3 of said section reads as follows:

"All stock corporations or mutual associations transacting the business of workmen's compensation insurance in this state under the terms of subdivision (2) of this section *shall be subject to the rules and regulations of the commission with respect to rates to be charged,* and methods of compensation to be used." (Italics ours.)

Under this provision, taken in connection with other provisions of the act, the defendant commission insists it has the power to fix the rate to be charged by stock corporations and mutual associations doing business under the act. In support of its contention it cites numerous well-considered cases showing that the power to regulate with respect to fees, rates, and compensation implies the power to fix and determine them. *Higgins* v. *Mitchell County Commissioners,* 6 Kan. App. 314, 51 Pac. 72; *Commonwealth* v. *Bailey,* 81 Ky. 395; *Taxicab Cases,* 82 Misc. Rep. 94, 143 N. Y. Supp. 279; *State* v. *Atlantic Coast Line R. R. Co.,* 59 Fla. 612, 52 South. 4; *Norfolk Belt Line R. Co.* v. *Commonwealth,* 103 Va. 289, 49 S. E. 39; *Midland Valley R. R. Co.* v. *State,* supra. See, also, *State* v. *Clarke et al.,* 98 Neb. 566, 153 N. W. 623, and *State* v. *Fremont, Elkhorn, etc., R. R. Co.,* 22 Neb. 313, 35 N. W. 118. It also contends that the language above italicized implies nothing else than the power to fix and determine the rate.

We confess our inability to see any escape from the logic of defendant's contention, and, in the absence of any showing on the part of the plaintiff as to what other or different meaning the language can have, we are disposed to hold that the power to fix the rate to be charged by the corporation or association referred to is conferred upon the defendant.

There is another view that may be taken in connection with

this subject not at all in conflict with the foregoing conclusion. Section 37 of the act deals with the classification of employments, accounts, transfers, and rating as applied to employments insured by the state. The last sentence of the section provides:

"The commission shall determine the hazards of the different classes and fix the rates of premium therefor based upon the total pay roll and number of employees in each of such classes of employment, at the lowest possible rate consistent with the maintenance of a solvent state insurance fund and the creation of a surplus and reserve; and for such purpose may adopt a system of schedule rating in such a manner as to take account of the peculiar hazard of such individual risk."

The question arises, when the Industrial Commission fixes the premium or rate for state insurance, as provided in the section just quoted, does not that ipso facto become the established rate for all insurers doing business under the act? Does not that become the rule, the regulation in respect to the rate to be charged by stock corporations and mutual associations, as well as the state? The logic of the whole subject-matter seems to support the affirmative view of the question. In fixing the rate for state insurance, as the law provides, the commission, after determining the hazards of the different classes, and other matters referred to in the section quoted, must then fix the premium at the lowest possible rate consistent with the maintenance of a solvent state insurance fund and the creation of a surplus and reserve. In any given case, unless the reasonableness of the rate is challenged, it must be presumed to be the lowest possible rate the business will safely permit. If in such case the commission accepts and approves a policy of a stock corporation or mutual association providing for a lower rate, the very act would be an impeachment of its own judgment, or be a confession at least that the corporation or association referred to can carry the insurance at a lower rate than the state is able to do. On the other hand, if the commission should approve and accept a policy from one of these corporations or associations at a

higher rate than the commission has fixed for insurance by the state, would it not be permitting an imposition upon the public, an imposition which the Industrial Commission has the power to prevent? These considerations which reveal the absurdity and inconsistency of any other view lead us to believe that the intention of the Legislature must have been that, when the Industrial Commission establishes a rate for state insurance, as provided by the law, the rate so established becomes the rate to which other insurers must conform. In our opinion, that is what is meant by the language ''shall be subject to the rules and regulations of the commission with respect to the rates to be charged.''

There is still another consideration which leads to the inevitable conclusion that the rate must be the same, both for the state and other insurers. It must be admitted that, whatever may be the power of the Industrial Commission to fix the rate, even for the state itself, still the rate when fixed is the subject of judicial inquiry as to its reasonableness or unreasonableness, and in a proceeding brought for that purpose all the data material to such inquiry may be considered. Now, if the commission has fixed one rate for the state and another for other insurers for the same class of risk, how can it be contended that both rates are reasonable? If one is reasonable, the other must be too high or too low, unless we are permitted to inquire into the relative ability of the state and other insurers to carry the insurance and discriminate in favor of one as against the other according to its ability. Such a consideration is not only untenable, but indefensible on any theory of equal opportunity and square dealing.

Upon first blush it may be considered that we are diverging from the question as to whether the law gives the commission power to fix the rate of insurance for insurers other than the state. But we are not diverging from that question at all. We have shown that section 37 of the act in the most positive terms gives the commission power to fix the rate for the state. Now, if the rate for all other insurers must be the same, it follows as a logical sequence, incontrovertible, that the law gives the commission power likewise to fix the rate for other insurers.

There remains but one question to be considered: Was the defendant justified under the law in refusing to accept and file the policy tendered by plaintiff on account of the "participating clause" it contained? Again we are at a disadvantage in not having a statement of plaintiff's position on that particular question. Defendant's position is best understood by quoting literally a portion of the brief filed by the Attorney General in behalf of defendant in which its position on this question is stated with remarkable clearness and perspicuity:

"Section 54 of the Industrial Commission Act provides: 'That if insurance so affected is not with the state insurance fund, the employer shall forthwith file with the commission in a form prescribed by it, a notice of his insurance, together with a copy of a contract or policy of insurance.'

"Sections 55, 56, and 57 contain the minimum requirements which contracts of insurance must contain. Section 44 of the act allows the commission, which is the custodian and manager of the state insurance fund, to divide aggregate balances remaining to the credit of any class of employment or industry, when the same may 'safely and properly be divided.' But section 44 also provides just what accounts must be kept and what reserves must be built up. It provides that the 'commission shall also set up and maintain a reserve adequate to meet the anticipated losses and carry on claims and policies to maturity.' It must also build up a surplus for catastrophes, hazards, and other unanticipated losses. The commission is given no arbitrary power to return excess. The conditions of divisions are definitely specified, and what may be designated as 'earnings' are specifically defined. The participating rider of the plaintiff's contract is, on the other hand, indefinite. It is impossible to tell what the insured may participate in, or when the participation is to take place, or under whose control rests the decision as to what amount or under what conditions division shall be made. If it is determined that the commission has power to fix a rate, then that power is worthless if the insurer may return to the insured the part of the premium under such conditions as only it, the

insurer, may impose. If the Industrial Commission has no power to regulate or fix the conditions under which a division can be made, the power to fix a rate is nil. But if the commission has power to see that the division is not made, except under such conditions as will not impair the company's reserve, then certainly it has power to reject the policy which agrees to do something which may be entirely opposed to the conditions which the commission has power to impose.

"It may be argued that the insurer has the right to divide its earnings either among its shareholders as dividends or among its policy holders or among both. We do not deny this, provided what it wishes to divide is real earnings. The participation clause is not limited to earnings. It contains nothing definite as to what will be divided. What are earnings may be a question of utmost importance. If the insurer should contend that reserves needed to carry liability through to maturity are earnings, certainly a division of such so-called earnings would impair the company's ability to meet claims and subvert the very purpose of the act.

"In this connection it is instructive to consider the different classes of liability which may arise under the act against insurance companies, and upon which real earnings depend.

" (1) There is the liability which, at the end of the premium period, is fully matured and paid, such as the loss of a finger for which the compensation period has run. Section 77.

" (2) There is a second class of liability of the same nature, not yet carried to maturity, but for which the amount necessary to carry it to maturity may be definitely calculated and determined, such as the loss of a finger or limb unapt to result in complications for which compensation is due in installments for a definitely calculated time after the termination of the premium period. Section 77.

" (3) There is the class of permanent total disability for which it is impossible, in spite of experience, on account of the compensation running until death, to calculate the exact reserve needed to carry the compensation to the end. Section 78.

" (4) There is the class of permanent partial disability, in-

definite, but for which the maximum necessary reserve may be figured by assuming that it will last for the maximum period of six years.   Section 77.

"(5)   There is the class of temporary disability, either partial or total, for which the maximum reserve may be calculated by assuming the disability to be total for the full period of six years.   Section 76.

"(6) There is the class of injury which may result in death, within three years.   Section 79.   The compensation payable under this section is indefinite for two reasons: First, because it is impossible to tell what injuries may result in death; and, secondly, because the question of dependency is involved. Section 79.   Unless for all cases of injury which may possibly result in death within three years the company puts aside $4,500, the maximum amount of compensation figured for the wage for a period of six years from the date of the injury, or at least the maximum amount for all the dependents who may survive, it would be impossible to determine whether the reserves are sufficient.

"(7) Diseases resulting from an injury.   Section 52, subsec. 5, of the Industrial Commission Act.   In this class the injury may be fully compensated for, and disease result, and yet disease later resulting would be subject to compensation.

"The commission under section 83 of the act has power to open the case and make a new award.   Classes 3 and 7, therefore, are such injuries as not to admit of a calculation affecting reserves.   Classes 4, 5, and 6 only permit of a calculation of an amount of reserves to meet them, if the amounts set aside are such as, when interest is calculated, will pay a claim of a maximum liability.

"Under these indefinite liabilities what should be kept as reserve and what considered as earnings are uncertain quantities.   If a company may enter into a contract allowing the insured to participate when the basis or nature of that participation is not specified, there is then absolutely no assurance that the company will remain solvent.   As stated before, the purpose of the act is not only to insure compensation, but to insure that the insurer will remain able to carry the liability to maturity.

"The Industrial Commission is the proper and only body in which such power should lie. If it has not power to determine what is a sufficient reserve, or at least power to prevent the effecting of a contract which from its very indefiniteness may allow the impairment of reserve, the fundamental principle of the act is annulled. It seems legally and morally untenable that the commission has not authority in law to prevent the filing and effectiveness of a contract which may be a promise to give back money that may be needed to carry out the obligations of the insured and needed to assure the effectuation of the fundamental purposes of the act.''

We have carefully examined the sections of the act referred to in the foregoing excerpt from the defendant's brief and the conclusions defendant draws therefrom, and believe its conclusions, if not invincible, are at least justified from the standpoint of sound reason.

If the law in question is to consummate the beneficent purpose for which it was intended, the first requisite, so far as the insurance feature is concerned, is to take every precaution within the power of the commission to protect the fund from which compensation is to be paid. Of what avail is the fixing of a rate of insurance, based upon careful estimate with the view of maintaining the solvency of the fund from which compensation is to be paid, if the insured and insurer by means of an uncertain, indefinite clause in the policy can evade the spirit and intention of the law?

The court is of the opinion the commission had authority to reject the policy tendered by plaintiff.

For the reasons heretofore stated, defendant's demurrer to plaintiff's petition is sustained.

It is therefore ordered that the alternative writ heretofore issued be quashed, and the peremptory writ prayed for denied; defendant to recover costs.

FRICK, C. J., and McCARTY, CORFMAN, and GIDEON, JJ., concur.