2001 UT App 370

**COLOR COUNTRY MANAGEMENT dba Sizzler Restaurant and/or Mid–Century Insurance Company, Petitioner,**

v.

**LABOR COMMISSION and Nellie Thomas, Respondents.**

No. 20001019–CA.

Court of Appeals of Utah.

Dec. 6, 2001.

Carrie T. Taylor and Mark R. Sumsion, Richards, Brandt, Miller & Nelson, Salt Lake City, for Petitioner.

Aaron J. Prisbrey and Virginius Dabney, Dabney & Dabney, St. George, for Respondents.

Before JACKSON, Associate P.J., and DAVIS and THORNE, Jr., JJ.

## OPINION

DAVIS, Judge:

¶ 1 Color Country Management and Mid Century Insurance Company (collectively Color Country) petition for review of the action of the Labor Commission pursuant to Utah Code Ann. §§ 34A–2–801(8) (1997), 63–46b–16 (1997),[1] and Rule 14 of the Utah Rules of Appellate Procedure.[2]

## BACKGROUND

¶ 2 Because Color Country does not challenge the Appeals Board's findings of fact, we recite the relevant facts from the Board's order on Color Country's motion for review. *See Osman Home Imp. v. Indus. Comm'n,* 958 P.2d 240, 241 n. 1 (Utah Ct.App.1998).

¶ 3 Nellie Thomas was employed by Color Country at its Sizzler restaurant where she worked preparing salads and maintaining the salad bar. On October 15, 1994, Thomas,

---

1. The Utah Administrative Procedures Act (UAPA) applies to all administrative proceedings commenced on or after January 1, 1988. *See* Utah Code Ann. § 63–46b–22(1) (1997); *South Davis Cmty. Hosp. v. Dep't of Health,* 869 P.2d 979, 981 (Utah Ct.App.1994). Because any changes to UAPA during the pendency of this claim are of no consequence to the disposition of this appeal, we cite to the most recent version for the sake of convenience.

2. Color Country refers to the Commission in its motion for review and throughout its brief although the decision under review was issued by the Appeals Board. A decision of the Appeals Board is treated as a final order of the Commission unless set aside by this court. *See* Utah Code Ann. § 34A–1–303(2)(c)(ii) (1997).

while taking dirty dishes from the salad bar to the dish-washing station, slipped in a puddle of greasy water, fell, and fractured her ulna, dislocated the radial head, and tore the rotator cuff in her left arm. She also sustained injury to her spine. Thomas had six surgical procedures over the next few years, including the attachment of a metal plate in her arm; removal of a loose screw; a bone graft and reapplication of a dynamic compression plate; surgery on her rotator cuff; surgical removal of the second plate; a cast on her arm due to a new fracture through one of the screw holes; and another surgical procedure to repair yet another fracture with another bone graft, this one through the callus.

¶ 4 On May 15, 1997, Thomas filed an application for a hearing regarding her workers' compensation claim. An administrative law judge (ALJ) held an evidentiary hearing on January 6, 1998. On January 8, 1998, the ALJ awarded Thomas temporary total disability benefits of $140 per week and specifically reserved ruling on permanent partial and permanent total disability.

¶ 5 On June 23, 1998, the same ALJ issued a supplemental order, citing a January 20, 1998 report[3] by Dr. Scott Smith in which Dr. Smith gave Thomas a twenty percent whole person impairment rating based on the problems she had with her left arm, shoulder, and her neck. The ALJ awarded Thomas permanent partial disability benefits based on the twenty percent whole person impairment, with a credit for amounts already paid by Color Country, and reserved ruling on permanent total disability.

¶ 6 On August 11, 1998, the same ALJ issued a third order finding that because Thomas had reached medical stability, the issue of permanent total disability was now "ripe for determination," and concluded Thomas was "tentatively permanently totally disabled." He ordered Color Country to pay subsistence benefits of $140 per week, suspended permanent partial payments, and informed the parties that Color Country could submit a reemployment plan and request a hearing on the plan.

¶ 7 In September 1998, Color Country submitted a reemployment plan and requested a hearing. In the meantime, the first ALJ retired and a second ALJ held a hearing March 8, 2000, regarding the reemployment plan submitted by Color Country. On May 18, 2000, he issued an abstract based on the August 11, 1998 award. On June 14, 2000, the second ALJ issued an order in which he reaffirmed the earlier orders, rejected the reemployment plan, and entered a final award of permanent total disability.

¶ 8 Color Country subsequently filed two motions for review: one filed June 16, 2000, to have the Appeals Board review the propriety of the abstract, and one filed July 14, 2000, to have the Appeals Board review the compensation award.

¶ 9 In its October 31, 2000 order addressing the compensation award, the Board found that by January 20, 1998, Thomas had reached medical stability with permanent impairments to her left shoulder consisting of limitations to her range of motion, "joint crepitation, and distal clavicle resection." The Board determined that Thomas had a twenty-nine percent impairment of the left shoulder, which it equated as a seventeen percent whole person impairment. The Board described the neck impairment as "critical signs of impairment without radiculopathy or loss of motion, but with some evidence of arthritis for [a] 5% whole person impairment." The Board determined that these impairments, when combined, produced a twenty percent whole person impairment.

¶ 10 The Board agreed with the earlier findings by the ALJ that Thomas could not perform other work reasonably available when taking into consideration her "age, education, past work experience, medical capacity and residual functional capacity." The Board noted that Thomas had over thirty years experience as a certified nursing assistant, but that she could not resume those duties due to her impairment. The Board found that she could not return to her job at

**3.** Although the impairment rating was done January 20, 1998, it was not received by the Commission until June 22, 1998.

Sizzler due to her impairment, and that her circumstances limited her ability to do other work reasonably available in the area where she lived.

¶ 11 The Board then examined the reemploymnet plan that Color Country submitted. The Board noted that the plan did not provide for "education, training, accommodation of physical problems or payment of continuing disability compensation to provide for ... subsistence during the period of rehabilitation and reemployment."

¶ 12 Based on its findings, the Board concluded that Thomas had carried her burden of proving permanent total disability and that she was entitled to an award of $131 per week, reduced from the $140 per week awarded by the ALJ.[4]

¶ 13 After the Board's October 31, 2000 decision affirming the ALJ's rejection of the reemployment plan and the award of permanent total disability, Color Country filed a petition for judicial review in this court pursuant to section 34A–2–801(8), section 63–46b–16, and Rule 14 of the Utah Rules of Appellate Procedure.

¶ 14 On January 22, 2001, the Commission denied the motion for review of the abstract by stating that the Appeals Board would not take any action on the motion for review of the abstract because "it appears your motion for review is moot" due to a stay granted by the district court.

### ISSUES AND STANDARD OF REVIEW

¶ 15 On appeal, Color Country argues that (1) the Commission misinterpreted Utah Code Ann. § 35–1–67 (1994);[5] (2) its due process rights were violated by the Commission, and if the Commission interpreted and applied section 35–1–67 correctly, then section 35–1–67 is unconstitutional on its face and as applied; and (3) the abstract was improperly issued because there was no final order at the time it was issued.

4. The reduction of benefits is not an issue on appeal.

5. Utah Code Ann. § 35–1–67 (1994) was the applicable statute for awarding permanent total disability benefits at the time Thomas sustained

■ ¶ 16 "Judicial review of final agency actions is governed by the Utah Administrative Procedures Act." *Viktron/Lika Utah v. Labor Comm'n,* 2001 UT App 8, ¶ 5, 18 P.3d 519. Under section 63–46b–16, we may grant relief "only if, on the basis of the agency's record, [we] determine[ ] that [Color Country] has been substantially prejudiced" because "the agency action, or the statute or rule on which the agency action is based, is unconstitutional on its face or as applied" or if "the agency has erroneously interpreted or applied the law." Utah Code Ann. § 63–46b–16(4)(a), (d) (1997).

■ ¶ 17 Whether the statute itself is unconstitutional, and whether the agency interpretation of the statute is unconstitutional or incorrect, are questions of law that are reviewed under a correction of error standard. *See Esquivel v. Labor Comm'n,* 2000 UT 66, ¶¶ 13–19, 7 P.3d 777; *Morton Int'l, Inc. v. Auditing Div.,* 814 P.2d 581, 587–89 (Utah 1991); *Velarde v. Board of Review,* 831 P.2d 123, 125 (Utah Ct.App.1992). "Due process challenges are questions of law that we review applying a correction of error standard." *West Valley City v. Roberts,* 1999 UT App 358, ¶ 6, 993 P.2d 252. Whether there was a final order at the time the abstract was issued involves the construction of statutory provisions and is a question of law which we review for correctness. *See Esquivel,* 2000 UT 66 at ¶ 13, 7 P.3d 777.

### ANALYSIS

¶ 18 We first address Color Country's claim that the Commission interpreted section 35–1–67 incorrectly by requiring Commission approval of a reemployment plan. Color Country also argues the Commission erred by concluding that the reemployment plan must include subsistence payments and that the plan was unreasonable.

¶ 19 According to Color Country, the hearing called for in section 35–1–67 is merely to determine whether the reemployment plan is

her workplace injury. *See Abel v. Indus. Comm'n,* 860 P.2d 367, 369–70 (Utah Ct.App. 1993). The current version, as amended, is codified at Utah Code Ann. § 34A–2–413 (1997).

or has been successful, and it does not confer on the Commission the authority to approve or disapprove the reemployment plan.

■ ¶ 20 Section 35–1–67 allows an employer to submit a reemployment plan for an employee who is seeking permanent total disability benefits:

(6) (a) A finding by the commission of permanent total disability is not final, unless otherwise agreed to by the parties, until:

. . . .

(ii) the employer or its insurance carrier *submits* to the commission a reemployment plan as prepared by a qualified rehabilitation provider *reasonably designed to return the employee to gainful employment* or the employer or its insurance carrier provides the commission notice that the employer or its insurance carrier will not submit a plan; and

(iii) the commission, after notice to the parties, *holds a hearing*, unless otherwise stipulated, *to consider* evidence regarding rehabilitation and *to review* any reemployment plan submitted by the employer or its insurance carrier under Subsection (6)(a)(ii).

Utah Code Ann. § 35–1–67 (1994) (emphasis added). When interpreting statutory provisions, we are guided by our primary purpose of giving effect to the legislative intent, and we first turn to the plain language of the statute to divine this intent. *See Regal Ins. Co. v. Bott,* 2001 UT 71, ¶ 10, 31 P.3d 524.

■ ¶ 21 The verb "review" is defined as: "to go over or examine critically or deliberately"; "to go over with critical examination in order to discover excellences or defects"; and "to make a formal or official examination of the state of" something. Webster's Third New International Dictionary 1944 (1986). This meaning, taken together with the requirement that the employer "submit" the plan, that the commission "consider" evidence, and that the plan be "reasonably designed to return the employee to gainful employment" convinces us that the plain meaning that the Legislature intended by its use of the word "review" in section 35–1–67(6) was to have the Commission independently evaluate and approve the employer's reemployment plan. We think it is clear that to require an entity to submit something to an agency charged with implementation of a remedial act and ask the agency to review it for reasonableness requires an evaluation and the agency's approval. The alternative construction urged by Color Country, if carried to its logical extreme, would give employers who sought to avoid paying compensation the ability to draft a plan that an employee had no chance of fulfilling and then deny benefits because the employee was not cooperating with reemployment efforts. This would be in direct contravention to the larger purpose and spirit of the Workers' Compensation Act. *See Wilstead v. Indus. Comm'n,* 17 Utah 2d 214, 407 P.2d 692, 693 (1965) (stating the purpose of the Act is to insure income to an injured employee and his or her family and eliminate expense, delay, and uncertainty of the employee in having to prove negligence, and to place the burden of industrial injuries on industry); *Industrial Comm'n v. Daly Mining Co.,* 51 Utah 602, 172 P. 301, 306 (1918) (rejecting employer's construction of the Act because it would in large measure "make it useless and of no material benefit"). We thus reject the construction urged by Color Country and conclude the Commission did not err in interpreting section 35–1–67 to require Commission approval of the reemployment plan.

■ ¶ 22 We also reject Color Country's argument that the Commission erred in ruling that the statute requires that the reemployment plan provide for the payment of subsistence benefits. Section 35–1–67(6)(c)(ii) plainly states that a plan "*shall* include payment of reasonable disability compensation to provide for the employee's subsistence during the rehabilitation process." Utah Code Ann. § 35–1–67(6)(c)(ii) (1994) (emphasis added). Thus, not only was the Commission's decision that the subsistence benefits must be included in the plan correct, it was also correct to rule the plan was defective for failing to do so. Moreover, the second ALJ pointed to an additional shortcoming of the plan when he rejected it. According to the June 14, 2000 order, the plan was defective because the physical work re-

strictions for Thomas contained in the plan were materially different than those specified by Dr. Smith and referred to in the August 1998 order awarding permanent total disability benefits. The ALJ noted that Kit Bertsch, who drafted the reemployment plan for Color Country, testified she was never given a copy of the August 1998 order or Dr. Smith's restrictions for Thomas. She also testified that, had she received these materials, she would have relied upon them in drafting the reemployment plan. The Commission correctly applied the law in determining that the plan was not reasonable.

¶ 23 Color Country next argues that its due process rights were violated by the Commission and that section 35–1–67 is unconstitutional because it violates the due process clauses of the Federal and Utah Constitutions. Color Country cites to the Fourteenth Amendment to the United States Constitution and Article 1, Section 7 of the Utah Constitution in making this argument, but it does not articulate any basis for interpreting the two provisions differently or suggest that Article 1, Section 7 entitles it to greater protection than that afforded by the Fourteenth Amendment. Thus, we analyze this claim only under the due process clause of the Fourteenth Amendment and we undertake no independent analysis of Article 1, Section 7 of the Utah Constitution. *See State v. Kohl,* 2000 UT 35, ¶ 12 & n. 3, 999 P.2d 7.

¶ 24 Notwithstanding that the general policies and provisions of workers' compensation acts are not unconstitutional,[6] particular provisions of these acts may yet run afoul of the Constitution, and so we now turn to consider the specific due process challenges raised by Color Country.

■ ¶ 25 Color Country's due process argument has several components. First, it argues that its due process rights were violated because the issues of permanent partial and permanent total disability were not ripe for consideration at the time of the first hearing before the ALJ on January 6, 1998. The basis for this argument is that Thomas had not reached medical stability by the time of the first hearing, and she had not received any permanent work restrictions. Color Country argues that the permanent partial and permanent total disability claims should have been dismissed at the first hearing, and because these issues were not dismissed, the Commission "exceeded its adjudicative authority and denied [Color Country's] due process rights to a meaningful hearing." We reject this argument.

¶ 26 The ALJ's January 8, 1998 order awarded only temporary total disability benefits and expressly reserved ruling on the permanent partial and permanent total disability issues because Thomas had not reached medical stability. Workers' compensation claims are best viewed as a process, rather than as a discrete event, and the Commission had continuing jurisdiction over

**6.** According to Professor Larson, the American system of workers' compensation that evolved near the turn of the twentieth century differed from the German system, which incorporated contributions from the workers for insurance, in that it imposed "unilateral liability without fault upon the employer," and made the employer "bear the entire burden of any insurance against that liability." 1 Arthur Larson & Lex K. Larson, *Larson's Workers' Compensation Law* § 2.06, at 2–11 (2001). Nevertheless, it is well-settled that workers' compensation acts in general, and the Utah Act specifically, do not violate the due process clause of the Fourteenth Amendment merely because they impose liability upon industry without regard to fault or because they have abrogated defenses available to employers at common law. *See Cudahy Packing Co. v. Indus. Comm'n,* 60 Utah 161, 207 P. 148, 152 (1922), *aff'd by* 263 U.S. 418, 44 S.Ct. 153, 68 L.Ed. 366 (1923). The United States Supreme Court reject-

ed due process challenges to state workers' compensation acts brought by employers in a series of cases decided the same day in 1917. *See New York C.R. Co. v. White,* 243 U.S. 188, 37 S.Ct. 247, 61 L.Ed. 667 (1917); *Hawkins v. Bleakly,* 243 U.S. 210, 37 S.Ct. 255, 61 L.Ed. 678 (1917); *Mountain Timber Co. v. Washington,* 243 U.S. 219, 37 S.Ct. 260, 61 L.Ed. 685 (1917).

Over the years, the Utah Supreme Court has rejected several due process challenges to the Workers' Compensation Act brought by employers, beginning as early as 1918. *See, e.g., Scranton Leasing Co. v. Indus. Comm'n,* 51 Utah 368, 170 P. 976, 979 (1918) (rejecting due process challenge brought by employer based on Commission's power to set insurance rates under the Act); *see also United Air Lines Transport Corp. v. Indus. Comm'n,* 107 Utah 52, 151 P.2d 591, 595 (1944) (rejecting argument of employer/insurer that the Act was unconstitutional because it allowed taking of property without due process).

Thomas's claims. *See* Utah Code Ann. § 35–1–78(1) (1994) (currently codified at Utah Code Ann. § 34A–2–420(1) (1997)); *Continental Casualty Co. v. Indus. Comm'n,* 79 Utah 532, 11 P.2d 329, 337 (1932) (stating that a single application for benefits gives Commission plenary jurisdiction to determine eligibility for all forms of benefits). Furthermore, we fail to see how Color Country was prejudiced by the ALJ's actions because there was no award of permanent partial disability made until six months after the January 1998 order, and there was no permanent total disability award made until eight months after the January 1998 order.

¶ 27 The second due process argument focuses on the procedures used by the Commission. Color Country claims that the Commission deprived it of a meaningful opportunity to be heard by the manner in which the evidence was considered. Color Country claims it did not have adequate notice that the Commission would consider the permanent partial and permanent total disability issues without an additional hearing or post-hearing opportunities to submit additional evidence by both parties. In addition, Color Country complains that the Commission violated its due process rights when the first ALJ allowed Thomas to submit "post-hearing evidence regarding her impairment rating and work restrictions." Color Country also complains that the second ALJ violated its due process rights by failing to consider certain evidence submitted by it and by failing to appoint a medical panel.

 ¶ 28 Under Utah Code Ann. § 35–1–88 (1994),[7] the Commission is not bound by the usual rules of evidence or any formal rules of procedure. Although proceedings for workers' compensation claims are very informal and of their own kind or class, the proceedings still must satisfy basic notions of fairness. *See Utah Fuel Co. v. Indus. Comm'n,* 59 Utah 46, 201 P. 1034, 1034–35

(1921). After a careful review of the record, we conclude that the procedures utilized here did not deprive Color Country of notice or a meaningful opportunity to be heard. As we noted above, the permanent partial and permanent total awards were first made six and eight months, respectively, after the January 6, 1998 hearing. Both parties submitted additional medical and other evidence and directed arguments to the ALJ after the first hearing, and there was no objection made to this informal process while it was going on.

¶ 29 In addition, the second ALJ, in his June 14, 2000 order, reviewed all the evidence, including the functional capacity evaluation (FCE) by Michael Meek and the independent medical examination (IME) by Dr. Root.[8] Thus, even if, as Color Country argues, the first ALJ failed to consider evidence submitted by Color Country, there were two more independent analyses of all the evidence submitted in this case: one by the second ALJ after the March 8, 2000 hearing and again by the Board on Color Country's motion for review, and we fail to see how Color Country was denied due process of law here. *See Vali Convalescent & Care Inst. v. Indus. Comm'n,* 649 P.2d 33, 36 (Utah 1982) (stating that due process does not always require a hearing prior to every administrative action nor is it necessary to hold a hearing at a particular point in a proceeding so long as a hearing is held prior to a final order becoming effective).

 ¶ 30 We also reject Color Country's claim that it was denied due process because there was no medical panel appointed. The appointment of a medical panel is discretionary and is called for when there are significant medical issues in dispute. *See Willardson v. Indus. Comm'n,* 904 P.2d 671, 674–75 (Utah 1995). Here, Color Country points to the reports of Drs. Root and Tebbs and claims there was a conflict in the evidence

---

7. Currently codified at Utah Code Ann. § 34A–2–802 (1997).

8. In fact, the second ALJ had to independently review the evidence and make his own findings on the issue of permanent total disability compensation because the first ALJ had mistakenly relied on Utah Code Ann. § 34A–2–413 (1997) instead of section 35–1–67. The second ALJ

addressed Thomas's claim and re-analyzed the findings made by the first ALJ under section 35–1–67, applying the statutory factors and those in the pertinent sections of the Administrative Code, and he reached the same conclusion as the first ALJ: that Thomas was entitled to permanent total disability compensation.

between these reports and that of Dr. Smith. However, the second ALJ specifically addressed this in his June 14, 2000 order. He considered all of this evidence and concluded that there was no conflict in the evidence sufficient to mandate a medical panel because the reports of Drs. Root and Tebbs were from November 1996 and January 1997, respectively. The ALJ pointed out that these reports were made over a year before Thomas reached medical stability and also noted that Dr. Root dealt only with Thomas's arm injuries and failed to include the injuries to her neck in making his impairment rating. The ALJ concluded that there was "no conflict in the medical records as neither Dr. Root, nor Dr. Tebbs, pretended to provide conclusive, comprehensive impairment ratings ... at a point of medical stability." We also note, as did the ALJ, that Thomas underwent two more surgical procedures after the reports of Drs. Root and Tebbs were prepared.

¶ 31 Moreover, as the Board noted in its October 2000 order, in Dr. Root's 1998 IME, his ultimate conclusion on Thomas's employability was: "I think her chances of being gainfully employed with all of these problems would be difficult." In the IME, Dr. Root also stated that "Ms. Thomas's complaints about neck and shoulder discomfort are directly related to the initial injury in October of 1994." Thus, Dr. Root's conclusions were not in conflict with the conclusions of Dr. Smith on these issues. Considering all of the above, we cannot say the Commission abused its discretion by not appointing a medical panel.

¶ 32 Color Country also argues that if the Commission's interpretation and application of section 35–1–67 is correct, then section 35–1–67 is unconstitutional on its face and as applied for additional reasons. Color Country argues that section 35–1–67 violates the due process clause because it does not provide time frames for the second hearing or any opportunity for corrective action following a second hearing. Color Country also argues that the Act is unconstitutional because there is no provision for recoupment of monies paid as subsistence benefits to an employee pursuant to an interim order if it

later turns out that the finding of permanent total disability was erroneous. Color Country argues that it can be years before such an order is judicially reviewed, and because the employee does not have to hold the money in trust, there is "little or no chance of any recovery."

¶ 33 It is clear that Color Country has a property interest in the monies it pays for compensation benefits and/or insurance premiums. It is equally clear that, for purposes of our due process analysis, there has been state action here. This issue turns, then, on whether Color Country received all the process it was due before the Commission deprived it of its property interest.

¶ 34 In *Mathews v. Eldridge*, 424 U.S. 319, 349, 96 S.Ct. 893, 910, 47 L.Ed.2d 18 (1976), the United States Supreme Court rejected a due process challenge brought by a recipient of social security disability benefits (SSDI) whose benefits had been terminated without a pre-termination hearing. In doing so, the Court identified three factors for analyzing procedural due process challenges: first, the private interest affected by the official action; second, "the risk of erroneous deprivation" of the interest by the procedures used and the probable value of additional or substitute procedural protections; and third, the governmental interest, "including the function involved and the fiscal and administrative burdens" of additional or substitute procedures. *Id.* at 335, 96 S.Ct. at 903; *see also In re S.A.*, 2001 UT App 307, ¶ 11, 432 Utah Adv. Rep. 21, 37 P.3d 1166.

¶ 35 In addressing each of these factors in the context of the SSDI benefits at issue in *Mathews*, the Court noted that due process is not a " 'technical conception with a fixed content unrelated to time, place and circumstances.' " *Id.* at 334, 96 S.Ct. at 902 (quoting *Cafeteria Workers v. McElroy*, 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961)). The Court pointed out that due process is flexible and calls for such procedures as are demanded by a particular situation. *See id.*

¶ 36 We adopted the reasoning and the factors from *Mathews* in *Lander v. Industrial Commission*, 894 P.2d 552, 555–57 (Utah Ct.App.1995), where we rejected a due

process challenge to a provision of the Workers' Compensation Act brought by an employee. In *Lander,* we compared the employee's interest to that in *Mathews* and concluded that the interest in *Lander* "[fell] short of a vested right to benefits" because Lander was not entitled to benefits yet, he was only entitled to apply for them. *Id.* at 555. Unlike the employee in *Lander,* the employer/insurer here, Color Country, has an interest more akin to the SSDI recipient in *Mathews;* that is, it has a vested right in property it already holds, not merely an expectation of being able to receive something in the future.

¶ 37 The second *Mathews* factor, however, weighs in favor of the Commission. In addition to multiple hearings on the issue of disability under the Act, the Commission also has the ability to reconsider prior rulings due to its continuing jurisdiction over claims. *See Spencer v. Indus. Comm'n,* 733 P.2d 158, 161 (Utah 1987) (holding that the Commission has continuing jurisdiction to modify awards when there are significant changes or new developments in a claimant's condition). Moreover, the procedures contained in UAPA are available to ensure accurate decision making by the Commission.[9] These include: a requirement that the Commission afford parties the opportunity to present evidence, argue, respond, conduct cross-examination, submit rebuttal evidence, and that testimony be under oath and recorded under section 63–46b–8; an opportunity for discovery under section 63–46b–7; written orders with findings of fact, conclusions of law, and the reasoning relied upon under section 63–46b–10; agency review under section 63–46b–12; agency reconsideration under section 63–46b–13; appellate judicial review under 63–46b–16; and the right to seek a stay of orders under 63–46b–18. These procedures closely approximate the full panoply of rights found in a full blown civil trial.

¶ 38 The *Mathews* Court pointed out that "the decision whether to [award] disability benefits will turn, in most cases, upon 'routine, standard, and unbiased medical reports by physician specialists.'" *Mathews,* 424 U.S. at 344, 96 S.Ct. at 907 (quoting *Richard-son v. Perales,* 402 U.S. 389, 404, 91 S.Ct. 1420, 1428, 28 L.Ed.2d 842 (1971)). The *Mathews* Court concluded that due to the nature of such decisions, the risk of error was low enough so that there was no need for a hearing before an employee's benefits were terminated, so long as there were procedures in place for a challenge to be brought following termination of benefits. *See id.*

¶ 39 The reasoning of the *Mathews* Court applies equally here. The procedures under UAPA outlined above, the nature of the evidentiary determination to be made, the fact that there were multiple hearings, continuing jurisdiction to cure defects, and the fact that the claimant bears the ultimate burden, all persuade us that the risk of erroneous deprivation under existing procedures is low, and that there is little, if any, probable value in the additional procedures suggested by Color Country.

¶ 40 The final *Mathews* factor requires an examination of the governmental interest at stake, including the burdens of added procedures. As the *Mathews* Court noted:

> At some point the benefit of an additional safeguard to the individual affected by the administrative action and to society in terms of increased assurance that the action is just, may be outweighed by the cost. Significantly, the cost of protecting those whom the preliminary administrative process has identified as likely to be found undeserving may in the end come out of the pockets of the deserving since resources available for any particular program of social welfare are not unlimited.

*Id.* at 348, 96 S.Ct. at 909. The concern with depleting limited social resources to add procedural protections is of particular significance here because one of the primary underlying purposes of the Act is to dispense with expense, delay, and uncertainty of recovery for employees. *See Wilstead,* 407 P.2d at 693.

¶ 41 Thus, we do not agree with Color Country that section 35–1–67 is constitutionally deficient for failure to mandate additional hearings or require that specific time lines

---

9. Except as limited by section 63–46b–1(2)(i).

be met. We also reject its argument that the Act provides for inadequate review. As we noted above, workers' compensation claims are best viewed as a process, rather than as a discrete event.

¶ 42 We also reject Color Country's argument that the statute is unconstitutional because there is no provision for recoupment of money paid under an interim order that is later reversed. In *Kerans v. Industrial Commission,* 713 P.2d 49 (Utah 1986), our supreme court ruled that an employer could not offset medical payments it had previously made for an employee's back injury that later turned out not to be compensable against an order to pay benefits based on the same employee's compensable neck injury. *See id.* at 54–55. Although the court did not rule on the constitutionality of this, nor was it raised, other courts from other jurisdictions have considered this precise question and have ruled that failure to provide a means for such a recoupment is not a violation of due process. *See, e.g., Hartford Accident & Indemnity Co. v. Duvall,* 113 N.H. 28, 300 A.2d 732, 734 (1973) (holding the New Hampshire Act did not provide for recoupment and that this was not a violation of the Fourteenth Amendment). Indeed, some states, as a result of employers obtaining stays during the sometimes lengthy appeals process, have enacted legislation specifically denying stays or providing for payment of workers' compensation benefits during appeal, and these provisions have also been held not to offend constitutional principles. *See, e.g., McAvoy v. H.B. Sherman Co.,* 401 Mich. 419, 258 N.W.2d 414, 422 (1977) (upholding provision that mandated paying 70% of award to employee during pendency of appeals); *Merchants Mutual Ins. Co. v. Newport Hospital,* 108 R.I. 86, 272 A.2d 329, 331 (1971) (upholding statute with "no-stay" provision).

¶ 43 On balance, we conclude that the risk of erroneous deprivation of Color Country's property interest under the procedures of section 35–1–67 and UAPA is so minimal that

the benefits of any additional procedures are outweighed by their administrative costs. In addition to the fiscal and administrative costs imposed by additional procedures, the delay and potential deprivation of benefits to claimants who have already met their initial burden of proving a compensable claim weighs heavily against Color Country, where the very purpose of the Act challenged is to do away with expense and delay and afford injured workers speedy, certain, and just compensation. Any claimed harm to employers and insurers in Color Country's position is also mitigated by the ability to spread the costs associated with the Act over an entire industry and then on to society as a whole by adjusting the appropriate rates of insurance premiums and charges. The procedures used by the Commission under section 35–1–67 and UAPA provided all the process that was constitutionally due before Color Country was deprived of its property interest.[10] All things considered, Color Country's arguments are best directed to the Legislature. *See Rekward v. Indus. Comm'n,* 755 P.2d 166, 169 (Utah Ct.App.1988) (rejecting appellant's argument for creation of a fifth class of disability benefits not contained within the Act and stating problem was one for the Legislature).

¶ 44 Color Country's final argument is that the abstract should not have been issued by the second ALJ because there was no final order at the time. The Commission concedes this point in its brief, although Thomas does not.

¶ 45 The abstract was issued under Utah Code Ann. § 34A–2–212 (1997), which states that an abstract "of any final order providing an award" can be filed under the Act with the clerk of the district court. At the time the abstract was issued, in May of 2000, the second ALJ's findings, conclusions, and order based on the March 2000 hearing had not yet issued, and there was no oral ruling from the bench at that hearing. Thus, the only order the abstract could have been based on was

---

**10.** Because we reject Color Country's "as applied" challenge, its facial challenge must necessarily fail. *See United States v. Salerno,* 481 U.S. 739, 745, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697 (1987) ("A facial challenge to a legislative Act is

... the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid.").

the August 1998 order by the first ALJ, tentatively awarding permanent total disability benefits to Thomas. Color Country argues that the August 1998 order, upon which the abstract is based, was not a final order, and therefore, the abstract was issued in error. We agree.[11]

¶ 46 The August 1998 order by the first ALJ made only a "tentative" award. Under *Union Pacific Railroad Co. v. Utah State Tax Commission*, 2000 UT 40, 999 P.2d 17, agency action is not final if it is "preliminary, preparatory ... or intermediate with regard to subsequent agency action." *Id.* at ¶ 16, 999 P.2d 17. Because the August 1998 order was of an interim nature, we conclude the order was not a final order, and hence, the abstract was improperly issued.

## CONCLUSION

¶ 47 We reject Color Country's interpretation of section 35–1–67 and affirm the Commission's determination that the reemployment plan was not reasonable. We reject Color Country's claim that the Commission and the statute deprived it of due process of law. We also conclude that the abstract was improperly issued. Accordingly, we reverse that part of the order issuing the abstract, and otherwise affirm.

¶ 48 WE CONCUR: NORMAN H. JACKSON, Associate Presiding Judge, and WILLIAM A. THORNE, Jr., Judge.

---

11. Color Country also argues that it is entitled to the costs and fees that arose from defending against the abstract, but because Color Country has failed to cite to authority of any kind in support of this argument, we decline to address it. *See* Utah R.App. P. 24(a)(9); *State v. Thomas*, 961 P.2d 299, 305 (Utah 1998).